Dennis McGOFF, Greg Aponiewicz, George Wood, Hubert Dixon, Thomas Tucker, Samuel L. Davis, Frank Metzger, Ronald Townes

v.

Thomas RAPONE, Superintendent, Delaware County Prison, William Moser, President, Del. Co. Board of Prison Inspectors, Sarah Brock, Member, Del. Co. Board of Prison Inspectors, Walter Swortz, Jr., Member, Del. Co. Board of Prison Inspectors, Richard Rex, Member, Del. Co. Board of Prison Inspectors, Philip I. Gibbs, Member, Del. Co. Board of Prison Inspectors.

Civ. A. No. 74-1229.

United States District Court,
E. D. Pennsylvania.

March 10, 1978.

As Amended April 6, 1978.

**10**

Richard G. Fishman, Prisoner Assistance Project, Legal Aid Bureau, Inc., Baltimore, Md., for plaintiffs.

Matthew S. Donaldson, Jr., Chester, Pa., for defendants.

### OPINION AND ORDER

**EDWARD R. BECKER, District Judge.**

INDEX

I. Preliminary Statement 10

II. Findings of Fact on Defendants' Motions 14

 A. The Prison and the Visiting Programs 14

 B. The Claims for Modification 16

 1. Increases in the Prison Population and in Contact Visitation 16

 2. Security Risks; Alternative Measures 16

 3. Contraband 17

 4. Impact on Rehabilitation Programs 18

 5. Increased Costs 19

 6. Inequitable Aspects of the Daily Schedule 19

III. Discussion 21

 A. The Motion to Vacate the Consent Decree 21

 B. The Motion to Modify the Decree 21

 1. Introduction 21

 2. Are We Dealing With a Bona Fide or Traditional Consent Decree? 22

 3. The Standard for Modification 24

 4. Application of the Modification Standard 25

IV. Plaintiff's Motion to Hold Defendants in Contempt 29

 A. Introduction 29

 B. Findings of Fact 29

 C. Discussion 30

 1. The Elements of the Civil Contempt Remedy for Monetary Damages 30

 2. Application of the Legal Standard: Existence of a Valid Decree in Plaintiffs' Favor and Knowing Violation by Defendants 31

 3. Application of the Legal Standard: Damages 32

## I. Preliminary Statement

This opinion considers a motion to vacate or modify a consent decree relating to the rights of inmates of the Delaware County Prison at Thornton, Pennsylvania, to what is known as "contact visitation." Contact visitation programs, which are becoming widespread in American correctional institutions, abandon the practice of separating inmates and visitors by a wire mesh screen or glass in favor of full personal access in some sort of visitors' lounge.

The case was instituted in May, 1974, by Edward L. Stanley, then a pre-trial detainee at the Prison, on behalf of himself and "all persons who have been, are, or will be pre-trial detainees held in Delaware County Prison." Named as defendants were the members of the Delaware County Board of Prison Inspectors, and the Superintendent of the Prison. The gravamen of Stanley's claim was that the legitimate interests of the state in the confinement of pre-trial detainees were so limited that denial of contact visitation constituted a deprivation of due process and associational rights.

After various pretrial proceedings, counsel for the parties came to an agreement that there should be contact visitation both for pre-trial detainees and sentenced prisoners, both men and women.[1] The extension of the privilege to sentenced prisoners was a function of defendants' view that to accord greater visitation rights to detainees than to sentenced prisoners in an institution in which they were housed together would create serious morale and discipline problems. This agreement was memorialized in a stipulation dated June 4, 1974, which also set forth a schedule of contact visitation to take place at the Chapel in the Men's Division and the Dining Hall of the Women's Division. The schedule provided a total of 9½ hours of contact visiting per week for both sentenced prisoners and pre-trial detainees. The stipulation further provided for dismissal of the action, pursuant to Fed. R.Civ.P. 41(a)(1). We approved the stipulation and the action was thereupon marked dismissed.[2]

An ensuing contact visitation program implemented the agreement. However, on September 24, 1975, the defendants moved for "modification of the stipulation" to reduce the hours of visitation on the grounds that an increase in the number of inmates at the prison and of the volume of contact visitations as well as attendant security problems made the program onerous. In June, 1976, we commenced a hearing on that motion[3] and developed an extensive record on the alleged changes in conditions which engendered it. Part of the record was developed during a visit which we made to the prison to inspect the facility. However, the hearing did not conclude with an adjudication because of the procedural problems which pervaded the proceedings and, in our view, cast doubt upon their validity.

We were concerned that, because the action had been dismissed, there was nothing

1. The stipulation made it unnecessary for us to address plaintiffs' constitutional claims. Plaintiffs cited impressive authority in support of their position that denial of contact visitation to detainees violated due process and associational rights, *inter alia Duran v. Elrod*, 542 F.2d 998, (7th Cir. 1976); *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974); *Rhem v. Malcolm*, 371 F.Supp. 594 (S.D.N.Y.1974); and *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972). *Cf. United States ex rel. Tyrrell v. Speaker*, 535 F.2d 823 (3d Cir. 1976). We also note the recent decisions in *Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977), and *United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114 (S.D.N.Y. 1977). We find no cases directly contra, and indeed the right of pre-trial detainees to contact visitation seems on the road to being "settled." *But see Feeley v. Sampson*, 570 F.2d 364 (1st Cir. 1978) 22 Cr.L. 2453 (3/1/78).

The question of the rights of sentenced prisoners to contact visitation is far more difficult. That question was mooted for us by the stipulation. We note that the 5th Circuit has recently held such prisoners to be entitled to "reasonable visitation" under the 8th Amendment, without specifying that the visitation need be "contact." *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir. 1977).

2. As we have noted, Stanley sought class certification. During the early stages of the case the parties agreed that the relevant criteria of Rule 23 for class action status were satisfied. However, we had not made a formal class certification at the time we were presented with the stipulation of dismissal. Since the parties seemed satisfied with a dismissal (accompanied by the stipulation which committed the defendants to contact visitation programs) rather than a consent decree, we did not, sua sponte, press the certification issue and determine the class. By way of hindsight, we regret our failure to have done so, and have rectified this situation in an order entered May 4, 1977, certifying a class "of all persons who are or who will be pre-trial detainees held in the Delaware County Prison." See further discussion at n. 24 *infra*.

3. The delay was a function of interim negotiations which sought to resolve the matter amicably.

before us to modify. In an effort to validate the proceedings in this regard, we suggested to the parties that they stipulate that the original stipulation of dismissal be deemed a consent decree. They agreed, and by order failed on June 7, 1976, during the course of the hearing, we so ordered. Our second concern was that there were no plaintiffs left to be represented. Mr. Stanley, the original plaintiff when the action was filed in 1974, had since left the prison, no interim interventions had been sought, and, as noted (*see* n. 2), no class action motions had been filed. In an effort to validate the proceedings in this regard, counsel for the parties consented to, and we ordered as the hearing commenced, the intervention of two new plaintiffs, Donald Williams and Marion Tillery.

Prior to the conclusion of the hearing we reconsidered the question whether we had possessed jurisdiction to transform the stipulation of dismissal into a consent decree and whether Williams and Tillery were proper parties. We questioned our power to "metamorphose" the stipulation of dismissal into a consent decree inasmuch as the original stipulation may have dispatched all life from the matter as of the date of its entry, June 4, 1974, leaving no viable case or controversy before us which could properly be subject to an order. We similarly questioned whether Messrs. Williams and Tillery had standing because: (a) as of the date the original plaintiff Stanley left the prison, there was no longer a live case or controversy; and (b) during the hearing, it became evident that Williams and Tillery, the intervened plaintiffs, were in fact not pre-trial detainees but sentenced prisoners, for which group contact visitation privileges had not been sought in the original complaint. Accordingly, on July 23, 1976, we delivered a bench opinion and

signed an order vacating the June 7, 1976 order which had converted the stipulation of dismissal into a consent decree (hereinafter "consent decree order").[4] We concomitantly dismissed defendants' motion to modify the decree for want of a live case or controversy, and vacated the order making Williams and Tillery intervenors of record.

On August 8, 1976, specifically relying upon our July 23, 1976 order of vacatur, defendants promulgated a new visiting schedule which retained the principle of contact visitation for both sentenced prisoners and pre-trial detainees, but reduced both the hours and days per week on which such visitation could occur. Other restrictions were imposed which we have detailed *infra*. Plaintiffs thereupon moved to hold defendants in contempt. We denied that motion in a bench opinion of August 13, 1976. In our view, our July 23rd order, by vacating the consent decree and dismissing defendants' motion to modify that decree, had left defendants free to promulgate a different visiting schedule. We should add that, to their credit, defendants did so only after consulting us for advice on the proposed schedule.[5]

Plaintiffs appealed. While the Court of Appeals dismissed plaintiffs' appeal from our denial of their contempt motion, *Williams v. Frey*, 551 F.2d 932, 936 (3d Cir. 1977), the court also decided that we had erred in vacating the consent decree order, in vacating the order permitting plaintiffs' interventions, and in dismissing defendants' motion to modify. The panel found our "misgivings" as to both the metamorphosis of the stipulation of dismissal and as to standing to be "misplaced." In essence, the Court of Appeals held that a stipulation of dismissal under Fed.R.Civ.P. 41(a)(1)(ii) is a "final proceeding" for purposes of Fed.R.

---

**4.** At the time we took this action we invited plaintiffs' counsel promptly to file a new lawsuit with proper plaintiffs, and have it assigned to our docket as a related case. We stated that we would incorporate the record already developed into the new proceeding, and thereupon decide the case. Counsel declined our invitation. By way of hindsight, he made a wise strategic discussion, because the filing of a new

suit would place the burden on plaintiffs, whereas resurrection of the original suit placed a heavy burden on defendants to show changed circumstances justifying modification of the stipulation.

**5.** We, of course, declined to give an advisory opinion.

Civ.P. 60(b), and that we therefore possessed the power to reopen the stipulation of dismissal, convert it into a consent decree, and entertain a motion to modify that decree. In reversing our July 23, 1976 order which had vacated our June 7, 1976 consent decree order, the Circuit Court in effect ratified our earlier conversion of the stipulation of dismissal into a consent decree. As to our concern about intervened plaintiffs' standing, the court held that Tillery had no standing since he was no longer at the prison, but that Williams, a sentenced prisoner, had been properly intervened because the stipulation of dismissal had conferred on him cognizable rights. 551 F.2d at 935.

In its opinion, the Court of Appeals "stressed" that "nothing in this opinion should be viewed to limit the defendants in renewing their application to modify the consent decree, if they should so desire." 551 F.2d at 936. After return of the record from the Court of Appeals, the defendants promptly moved to vacate or alternatively to modify the consent decree. Plaintiffs' counsel moved to intervene new parties, and on May 4, 1977, we granted that motion, at the same time certifying a class of present and future pre-trial detainees. Plaintiffs also moved to hold defendants in civil contempt for continuing to adhere to the more restrictive August 1976 visiting schedule after the Court of Appeals decision.

We commenced hearings on the renewed motions on June 10th, 1977. Prior thereto, the parties agreed that the extensive record on modification developed a year earlier should be incorporated by reference. A further hearing was of course necessary in order both to sharpen the positions of the parties and to supply a factual updating. Before recording of our findings of fact, and so as to put them in perspective, it will be helpful to summarize briefly the respective positions of the parties. We start with the defendants' position, since they are the ones seeking relief from the consent decree.

Defendants' motion to *vacate* the consent decree focuses upon the procedural history of this case. They argue that none of the parties understood, at the time, the consequences of converting the stipulation of dismissal into a consent decree, and that defendants should not be burdened either by possible contempt sanctions or a high standard of proof for modification, neither of which would exist if a stipulation of dismissal rather than a consent decree were in existence. Defendants' concomitant and alternative motion is to modify the consent decree. At the threshold however, defendants pose the motion in novel terms, asserting that if we deny the motion to vacate the consent decree in its entirety, equity at least dictates that we consider the consent decree to be governed by a lower legal standard for modification than consent decrees normally possess. This lower legal standard attains, in defendants' view, because of the conditions under which the order was entered, leaving both parties and the court with but a "minimal expectation of the finality" of the consent decree. Defendants recognize that, since the legal standard can only affect the extent of changed conditions necessary for modification, not their existence, they still must, whatever the legal standard, demonstrate some changed conditions to justify modification. This they believe to have done at two hearings by showing: (a) that the population of the prison and the popularity of the contact visitation program have increased substantially since the filing of the original stipulation of dismissal (subsequently converted into a consent decree); and (b) that the originally stipulated contact visitation program imposes unforeseen burdens on the prison due to contraband problems, security problems, administrative costs, and its adverse impact on rehabilitation programs. The plaintiffs, needless to say, controvert defendants' legal and factual contentions sur modification.

Plaintiffs' motion to hold defendants in contempt of court is based on the argument that since the Court of Appeals decision in *Williams v. Frey, supra,* had the effect of restoring our order converting the stipulation of dismissal into a consent decree, defendants had an obligation to abide by that

consent decree as of March 31, 1977, the date of *Williams,* instead of continuing to operate under the more restrictive contact visitation schedule put into effect on August 8th, 1976.

Following this preliminary statement we will make findings of fact, first describing the prison and the various visiting programs that have been in effect and then addressing the factual bases, *i. e.* changed conditions, for the defendants' motion to modify. In our discussion of the law we will first address defendants' motion to vacate the decree, which we find patently lacking in merit. Next we will turn our attention to the major subject of this opinion, the motion to modify the consent decree. As will appear, we reject the defendants' argument that what is before us is less than a traditional consent decree, and instead determine that conventional standards for modification are applicable. As will also appear, the burdens required to modify a consent decree are onerous ones which defendants have not met. Consequently, under those standards relief from the decree will be denied. Finally, we shall turn our attention to the request of plaintiffs that defendants be held in (civil) contempt for their noncompliance with the decree. We first find that imposing a coercive contempt order is wholly unwarranted under the circumstances, relegating plaintiffs to a contempt claim for monetary relief. In that regard, because of a failure of proof as to injury, one of the necessary elements of this kind of civil contempt case, plaintiffs' contempt motion must be denied.

II. *Findings of Fact on Defendants' Motions*

A. *The Prison and the Visiting Programs*

The Delaware County Prison at Thornton was built in 1932. By everyone's admission, it is a structure reflecting a bygone attitude toward prison design and construction. Colonel Gerald Frey, predecessor of the present warden, described the prison as a Model T competing in a modern Indianapolis 500 race. During the past several years, the period of time relevant to the motions before us, it has been used to house both sentenced prisoners [5a] and pre-trial detainees, the latter of course being presumed innocent, and incarcerated solely because they could not post bail in advance of trial. There has been, and is presently, an approximately equal ratio of sentenced prisoners to pre-trial detainees.

The Men's and Women's prisons are completely self-contained, separated by barbed wire fences, and a half-mile apart. Virtually all the testimony and evidence introduced at our two hearings focused on the Men's facility, which houses 85% of the inmates. It is basically a two-floor rectangle with four cellblocks, A, B, C, and D, dividing the rectangle into four equal widths. At the southeast corner of the rectangle protrude three additional cellblocks, E, F, and G. In the middle of the rectangle, running widthwise, and flanked by cellblocks A and B to the east and cellblocks C and D to the west is a large open area which serves as a messhall on the first floor and a chapel on the second. The chapel has been the situs of the contact visiting program from the program's inception in 1974 to present.

The means of entering and leaving this chapel are important, and were the subject of much discussion in the case. The sole means of access is through a room approximately 30 × 50 feet, on the first floor, directly in front of the messhall. This room is called the Center. In the words of former Superintendent Frey "the Center is the heart of the jail. It is the key to get anywhere." (N.T. 18) [6] Stairs lead from the first to the second floor of the Center, thence to a landing, and thence to the chapel. Literally every male prisoner at the Delaware County Prison must pass through the Center to go to the chapel. For example, a prisoner on the second floor of A

---

**5a.** The prison houses only relatively short term sentenced prisoners, *i. e.* those with sentences under five years. *See* 18 Pa.C.S.A. § 1362 (1977 Supp.).

**6.** "N.T." without a date refers to the four days of the June, 1976 hearing. The June 10 and June 13, 1977 hearings are each noted separately since they were transcribed as such.

block cannot walk directly to the chapel, also on the second floor, but must go to the first floor of A block, through a passageway to the Center and up the Center's stairs to the chapel. The Center has a set of stairs on either side of the room.

Not only must every prisoner go through the Center to reach the chapel, but every visitor must go through it as well. The prison entrance is directly north of and adjacent to the Center. During contact visitation hours, all visitors are ordered to a foyer, where they leave their personal belongings. From there they enter the Center and proceed to the chapel. As prisoners use one set of steps, visitors use the other, in a more or less continuous stream. The effect is like two parallel funnels, channeling prisoners and visitors in separate streams in close proximity. This physical arrangement underlies a major reason for seeking modification of the consent decree: the prison administration has been concerned that prisoners, while entering and exiting might take visitors hostage in the Center. The defendants were of course aware of the physical limitations of the prison when they agreed to institute the program and cannot assert a "changed circumstance" with respect thereto; however, reduction in the number of contact visits would, in the prison administrators' minds, reduce this danger.

Prior to October 14, 1974, inmates at the Delaware County Prison enjoyed very sparse visitation rights. Each prisoner could have only one visit per week, on Sunday, limited to 30 minutes and a maximum of three visitors. This was a "privilege" that could be withdrawn for any misconduct. Children under 18 were not generally permitted to visit. Perhaps most onerous of all, neither male nor female prisoners were permitted contact visitation. For men, the prisoner and his visitor sat in booths viewing each other through plexiglass, aptly described as "through the glass darkly." Communication was by means of a phone on either side of the glass partition. Female prisoners could talk directly to visitors only through a heavy wire-mesh screen. (Final pre-trial order # 7).

The new visiting arrangement, signed as a stipulation on June 4, 1974, and effective October 14, 1974, permitted visits during five separate periods spread over four days per week, according to the following schedule:

UNTRIED AND UNSENTENCED INMATES

| | |
|---|---|
| Mondays | 6:00 p.m. to 8:00 p.m. |
| Wednesdays | 1:00 p.m. to 2:30 p.m. |
| | 6:00 p.m. to 8:00 p.m. |
| Fridays | 6:00 p.m. to 8:00 p.m. |
| Sundays | 9:00 a.m. to 11:00 a.m. |

SENTENCED IMMATES

| | |
|---|---|
| Tuesdays | 6:00 p.m. to 8:00 p.m. |
| Thursdays | 1:00 p.m. to 2:30 p.m. |
| | 6:00 p.m. to 8:00 p.m. |
| Saturdays | 6:00 p.m. to 8:00 p.m. |
| Sundays | 1:00 p.m. to 3:00 p.m. |

Total visiting time was more than doubled by this schedule. In addition six visitors instead of three were permitted for each inmate each period. The half-hour limitation per visit was abandoned, and no limitation was set. All members of the inmate's family, including children, were permitted to visit. Visiting privileges could no longer be denied for general misconduct, but only for serious infraction of the visiting rules themselves. Most important, both men and women prisoners, pre-trial and sentenced, were permitted direct contact with visitors, rather than having a visit obstructed by plexiglass or wire screens. All of these changes were effected in recognition

that visitation makes it possible for an inmate to maintain contact with family. and friends; . . . that visits may give the inmate an opportunity to solve some of the practical problems caused by his or her confinement; . . . that Delaware County Prison should encourage visits from the inmate's family, friends and others concerned with the inmate's welfare and future; and . . that visitation is essential to the rehabilitation and reintegration process in terms of morale, maintenance of family life and community ties.

Stipulation, June 4, 1974.

Visiting at the Delaware County Prison proceeded in accordance with this agree-

ment for slightly over two years. However, on August 8, 1976, in the wake of our order of July 23, 1976, then Superintendent Frey promulgated a revised schedule for contact visitation. It provided for visits during the following hours:

| | Sentenced | Unsentenced |
|---|---|---|
| Saturdays: | 9–11 a.m. | 1–4 p.m. |
| Sundays: | 9–11 a.m. | 1–4 p.m. |
| Wednesdays: | | 6–8:30 p.m. |

An additional seven holidays per year augmented the visitation program. In the sum, this new schedule reduced the number of days per week on which visiting was permitted for each prisoner from four to two; it reduced the number of hours per week from 9½ to 4 for sentenced prisoners and from 9½ to 6 for pre-trial detainees; and it changed the duration of each visit from its unlimited status to a half-hour "minimum" (to be expanded as conditions permitted). Accompanying the revised schedule was a new condition, making all visitors subject to body search. To offset the reduced contact visiting time, the Superintendent permitted increased telephone privileges on week-nights.

The Delaware County Prison has continued to operate under this modified, more restrictive schedule from August 1976 to the present.

### B. *The Claims for Modification*

During the six days of testimony (four in June 1976, two in June 1977) defendants produced a number of possible reasons for modifying the decree. Their primary contention about changed conditions was that there had been substantial increases in the prison population and in the popularity of the contact visitation program since 1974. In turn, defendants argued, those increases have led to increased risks of hostage-taking in the Center and in the chapel; increased exchange of contraband between visitors and inmates; a deleterious impact on the rest of the prison's rehabilitation program; increased costs to a prison administration already short of funds; and inequities in the visiting program itself as it was originally administered and would again have to be administered under the consent decree. We consider the factual basis for each argument in turn.

### 1. *Increases in the Prison Population and in Contact Visitation*

Defendants demonstrated a sizeable increase in their average daily population (the following figures include men and women, sentenced and pre-trial). In June, 1974, when the original stipulation on contact visitation was signed, the population was 220 inmates. It climbed steadily, reaching almost 400 in May of 1976. The population fluctuated around this figure for nearly a year, and dropped to about 360 at the time of our second hearing in June, 1977, which represents a 64% increase over the 1974 figure. (Exhibit D–13).

The visiting rate shows that five months after contact visiting was implemented, in March, 1975, there were an average of 220 visits per week. By June of 1976, at the time of our first hearing, and when the prison population was reaching its peak, the figure rose to an average of 400 per week. Two months later defendants implemented the new visiting schedule, restricting both the hours per week and days per week of visiting. Following that, the average number of visits per week fluctuated between 250–400 until June, 1977, the time of our second hearing.[7]

### 2. *Security Risks: Alternative Measures*

Defendants' testimony established that the physical arrangements surrounding contact visitation created the risk of a hostage incident at two places—on the first floor Center, where visitors and inmates were in close proximity before ascending the stairs to the chapel, and in the chapel itself during visiting hours. At both places an armed inmate could seize a visitor. H. W. Schaffer, a prison inspector, described this as "very, very much of a security risk . . . in that Center any visitors could be liable, pregnant women, children or anything

---

7. For further discussion of visiting statistics *see* n. 22 *infra.*

could be taken hostage in that area." (N.T. 58, 62). We note, however, that in the thousands of hours of contact visiting from 1974 to the present, there have been no attempts to take hostages. (Superintendent Rapone, June 10, 1977 N.T. 41).

We also find that the physical arrangements at the prison are not new and unforeseen. The record clearly reflects that the prison administrators were aware of the physical set-up when they entered into the original stipulation in 1974.[8] Indeed, the pre-contact visiting program of plexi-glass booth visits involved precisely the same arrangement as to the proximity of visitors- and inmates in the Center, with the same attendant risk of hostages. (N.T. 77).

Another important area of the testimony addressed the question of available measures to reduce the risk of hostages. Dr. W. G. Nagel, one of the nation's pre-eminent authorities on prisons, inspected the Delaware County Prison during a contact visit (as well as on other occasions) and testified that searching the inmates *before* they entered the Center would reduce the chance of their carrying weapons into either the Center or the chapel, thereby greatly reducing the risk of a hostage situation. (N.T. 250). This proposal, which we find to be reasonable, had not been implemented—and indeed could not even be recalled by the prison administrators—by the time of our second hearing a year later. (June 10, 1977 N.T. 29–30, 34). Similarly, Dr. Nagel made suggestions concerning the use of "jumpsuits" by inmates. We credit that testimony, finding that the use of such clothing would reduce greatly the chance of prisoners carrying weapons into the visitor areas (as well as facilitate the detection of contraband). The testimony indicated that a sizeable number of such suits had been purchased subsequent to Dr. Nagel's suggestion; however, their use—if indeed they had ever been used at all—had been discontinued by the time of our second hearing.[9]

### 3. *Contraband*

We next consider the matter of "contraband" passing from visitors to inmates during contact visitation. "Contraband" is anything forbidden to prisoners by prison rules, such as cash or candy bars, as well as, of course, drugs. Superintendent Frey claimed that contact visitation "has become what I consider to be the primary source of contraband in the prison." (N.T. 155). During the 1976 hearings, the Director of Security at the Prison, Deputy Warden Kennedy, testified to finding inmates with contraband on five occasions immediately following contact visits. Two of those involved unspecified amounts of money (N.T. 141). Two others involved, respectively, $5 and $15 (N.T. 135–36). One incident, the

8. Plaintiffs Request for Admissions No. 8 read: Defendants were aware of potential security problems caused solely by the physical layout or structure of the contact visitation area and/or Delaware County prison at the time of their entering into the stipulation on June 4, 1974.

 Defendants' answer was: While it is admitted that defendants were aware of potential security problems caused solely by the physical layout or structure of the proposed contact visitation area within the prison, it is denied that defendants were aware of the extreme extent and severity of the security problems so created . . . N.T. 215–216.

9. Deputy Warden J. Kennedy testified jumpsuits were not in use as of June, 1977, though some 80 had been purchased in the summer of 1976 and had been used "from time to time." June 10, 1977 N.T. 34–36. However, F. Metzger, a prisoner who worked in the laundry room, testified that in September or October of 1976 he carried 60 unpackaged jumpsuits into the strip-search area, and a month later carried them back out, still in their unopened packaging, supporting an inference that a somewhat less than zealous attempt to use jumpsuits had been made. June 13, 1977 N.T. 23.

 Defendants also introduced testimony concerning proposed architectural changes at the prison which would eliminate entirely the risk of hostage incidents in the Center. Frankly, we were and continue to be puzzled as to the inference defendants would have us draw from such evidence: the most plausible one is that any present risk is of short duration, which hardly supports modifying the consent decree. We note in this regard that several months before this opinion was filed the Delaware County Council approved a bond resolution which would provide the financing to implement the architectural changes.

only one of the five which resulted in a criminal charge being filed, involved twelve capsules of a "controlled substance called Tianal" (N.T. 130, 143–44). By the time of our second hearing, almost exactly a year later, defendants produced four more incidents. Two involved money, $3 and $1 respectively. (June 10, 1977 N.T. 25, 26). The third incident involved a vial of marijuana oil a visitor intended to transmit to an inmate, and the fourth a packet of amphetamines found on an inmate.[10] In all, defendants produced nine incidents of contraband, three of which involved drugs, over the three year period as evidence of the need to limit contact visitation. During the three years these incidents occurred, approximately 32,500 contact visits took place,[11] each with an opportunity for the exchange of contraband; that amounts to approximately one incident for every 5,000 visits.

It is also important to note that *some* contraband exchange is clearly foreseeable in any contact visitation program. Accordingly, we find that defendants anticipated some when they stipulated to the program in 1974. Moreover, as we have noted, jumpsuits, whose very purpose is to prevent contraband concealment, have either not been used at all or have been used very reluctantly and sparingly (*see* p. 17 *supra*). We find their use to constitute an alternative less drastic than constricting visiting privileges as a means of eliminating contraband.

### 4. *Impact on Rehabilitation Programs*

Another area in which testimony was adduced in support of defendants' motion to modify related to the allegedly deleterious impact of contact visiting on prison rehabilitation programs. Several examples were

given. V. A. Guarini, Deputy Superintendent for Treatment and Services, testified that contact visitation drastically reduced his counseling services because his offices abutted the chapel and "when contact visitation is going on this negates the use of those offices." (N.T. 155). Mr. Guarini also testified that interest in the adult education program had steadily declined as contact visitation had become more popular. Speaking of the Adult Basic Education Program, the equivalent of Grades 1–8, he said:

> [Participation] has been dropping steadily since contact visitation . . . And the reason being the only thing we have been able to put our finger on is before it was a break . · . . Before it competed with all prison programs and had a good participation count. Now it only competes with contact visiting and it has got a poor participation count.

(N.T. 117).

We credit Mr. Guarini's testimony that contact visitation has interfered with attendance at various education and training programs. To say however that this constitutes interference with rehabilitation (programs) is to put the rabbit in the hat, as it were, by assuming that education and training programs provide more rehabilitation than contact visitation, an assumption neither we nor the defendants themselves, *see* Stipulation June 4, 1974 recited at pp. 15–16 *supra*, are prepared to make. See also discussion p. 27 *infra*. Moreover, the placement of counseling offices near the contact visitation site, and any consequent interference, must have been clearly foreseen when the program began. As will be noted in our Discussion, it cannot constitute the kind of "changed circumstance" justifying modification.

---

**10.** Defendants introduced two other purported incidents, exhibits D–10–2 and D–17–3. The former does not indicate that contact visitation was involved at all; the latter reflects the finding of "contraband" on a visitor prior to a contact visit, but with no indication the visitor intended to distribute the items during the visit. We therefore find both of these exhibits nonprobative.

**11.** This figure is an estimate. Defendants submitted figures showing 2,561 visits from October-December 1974, Exhibit 8(c), and 17,862 visits between January 1 and August 7, 1976, exhibit 9–A. That makes a total of almost 20,500 visits. No figures were submitted for the year 1975. We conservatively estimated 12,000 visits for this year, based on the visiting rates in 1974 and 1976, and the prison population in 1975.

### 5. Increased Costs

A fifth avenue of testimony concerned administrative burdens and costs of running the contact visitation program. Superintendent Frey testified he was short of guards, and had made budget requests for more personnel which were not approved. (N.T. 41). One consequence was that guards had to be switched from evening exercise programs to the contact visiting program, resulting in diminution of some evening recreation. (N.T. 87, 114). Another problem was that the prison guards had become unionized since the program's inception; under new contract terms, guards called in for a few hours of evening supervision of contact visitation had to be paid for four hours' work, and any of those held overtime had to be paid time and a half. (N.T. 156). Superintendent Rapone updated these figures during our 1977 hearing. By his estimate, because of union contract terms, it cost $260 per evening for ten guards to supervise contact visitation; for any given evening over the course of a year, the amount would be $260 × 52, or $13,520; for all six evenings required by the 1974 stipulation, the amount would be $13,520 × 6, or $81,120. (June 10, 1977 N.T. 58). Under their proposed schedule, defendants would only pay for one evening per week. Therefore, it would presumably cost them an extra five evenings per week, or an extra $67,600 per year, to reimplement the 1974 schedule.

This figure must be put in perspective. It represents the costs, post unionization, in 1977, of conforming to the terms of the 1974 stipulation. But, for purposes of the instant motion, the only evidence that is relevant are changes since 1974 that were *unforeseen* at that time. The $67,600 overstates the unforeseen amount considerably, for the prison obviously contemplated *some* salary expenditures when they agreed to a six evening per week visiting program in 1974. Neither party has offered evidence as to the cost of running the visitation

program in 1974. If we hypothesize it to be one-half of the 1977 rate—in other words, that unionization and inflation together have doubled the cost in three years—then the relevant figure is $33,800, not $67,600. Even this figure may overstate the amount, for defendants offered no proof whatever that either the rate of inflation or imminent unionization among prison guards were unforeseen and unforeseeable when they entered into the stipulation.[12] But even giving defendants the full benefit of the doubt on these points by assuming the whole amount was unforeseen, the $33,800 for personnel salaries attributable to the contact visiting program must be viewed against the background of the total prison budget. For 1977, the Prison had a total budget of $3,689,914. (Exhibit D–15–1). That means that to conform to the decree schedule would cost the prison an additional 9/10 of 1% of its budget, and a little over 2% of the amount of that budget spent on security ($1,480,455), the sub-item to which these guards' salaries belong. Moreover, defendants made no real showing on the critical issue: that a 1% increase in its budget (or otherwise put: taking this amount from somewhere else in the budget) would have a deleterious impact on the prison. The lone example of guards being transferred from evening recreation hardly constitutes persuasive or sufficient evidence.

### 6. Inequitable Aspects of the Daily Schedule

The sixth, and final, area of testimony centered around what defendants styled "the inequitable aspects of the daily schedule." (Defendants' Memorandum in Support of Motion to Modify). Basically, the inequity relates to the fact that under the 1974 stipulated schedule, it not infrequently occurred that one inmate who had already received a number of hours of visits in a given week received additional Sunday vis-

12. As to unionization, probative evidence might have described unionization efforts, or lack thereof, at facilities comparable to the Delaware County Prison during 1974, and past unionization activities at the Delaware County Prison itself. It is difficult to believe that there had been no harbinger of things to come.

its to the exclusion of another inmate who had not received previous visits. This particularly occurred on a crowded day, depending on which visitors arrived first and how long they stayed. Defendants sought to alleviate this inequity in several manners in their 1976 schedule: by granting proportionately more visiting time on Sunday, the most popular visiting day, and by providing procedures, including limits on the number of visitors and amount of visiting time, whereby weekly visiting could be more equitably distributed among inmates.

In support of having these procedures embodied in the consent decree, defendants introduced evidence that under the 1974 schedule most of the visiting time was on weekdays, which were not heavily used. N.T. 183. The few Sunday hours were overcrowded—"100 people backing up trying to get in between nine and eleven." (June 10, 1977 N.T. 100, 1976 N.T. 69). We infer from this testimony that inequities in the distribution of visits are likely to be present under the originally stipulated schedule, absent some procedure for regulating distribution. We note that plaintiffs' expert witness, Dr. Nagel, generally supported defendants on this point:

I see no objection to limiting the length of visits during the most crowded periods. We did it.[13] It was not just done arbitrarily. It was clearly announced and was part of our policy that everybody understood. The policy would be something to the effect that persons who have had visits during the week would be entitled only to about an hour visit on Sunday or whatever. I felt you could also limit the number of visitors on Sunday. I think the person is allowed to have six visits. Sunday is a day of great congestion. It could become a clear policy articulated well in advance and not pull any surprises on anybody saying the visitors would be limited to three on Sunday or to even further limit it to specific persons. Immediate members of the family or whatever.

I can see administrative decisions that would restrict the overcrowding on Sunday and the inherent dangers and the inherent discomfort to visitors and to inmates and staff. And it could be done in such a way that it is not cutting back on the principle of contact visits.

N.T. 265. We credit defendants' factual contentions as to the inequities created by the original (1974) contact visitation standards. We also agree with the spirit of Dr. Nagel's testimony.

Plaintiffs appear to be content with the 1974 schedule, notwithstanding that it permits only two hours of visiting time on Sunday for both pre-trial detainees and sentenced prisoners, and no daytime visiting time on Saturday for either pre-trial detainees or sentenced prisoners.[14] By way of contrast, the 1976 schedule permits 5 hours of daytime Saturday and Sunday visits for both detainees and sentenced prisoners (but no weekday or weeknight visitation except Wednesday 6–8:30 p. m. for detainees). This paucity of weekday visiting obviously explains the preference for the 1974 schedule, despite its limitation on Sunday visitation.

It would be unjust for a program designed to aid prisoners to become oppressive in operation, as both defendants and plaintiffs' expert have testified, because the prison cannot make basic rules on the distribution of visits among inmates. We have, without success, urged the parties to negotiate this point. What we emphasize here is that defendants' argument on this point is qualitatively different from its previous points: while the evidence of population increase, security, contraband, costs, and the rehabilitation program have been proffered as justification for restricting the visiting program to the detriment of the inmates, the instant evidence argues rather for distributing on an equitable basis, for the benefit of all inmates, whatever visiting hours exist. Therefore, this last category

---

13. Dr. Nagel was referring to his own (previous) experience as a prison warden.

14. That schedule permits Friday and Saturday evening visits for detainees and sentenced prisoners respectively.

of evidence, unlike the other lines of evidence, does not by its logic support the granting of defendants' motion to modify the decree. Rather, it supports interpreting any visiting schedule that exists to permit some administrative procedures for equitably distributing visits so that prisoners' morale will not be adversely affected. We discuss this issue further at n. 24 *infra*.

## III. *Discussion*

### A. *The Motion to Vacate the Consent Decree*

■ Defendants' motion to vacate the June 7, 1976 consent decree is based upon the premise that that order, at the time it was entered, was not intended to be "final" by either party or by the court. Rather, defendants say, it was intended to be a temporary expedient, a procedural vehicle to make possible a hearing concerning changes in the 1974 visiting schedule. Therefore, this "interlocutory" (hence "non-final") consent decree should be vacated.

There are two problems with defendants' argument. The first is that its initial premise, *i. e.* that both parties and the court intended the consent decree to be a mere temporary expedient, is partially untrue and partially unprovable. It is simply untrue as to plaintiffs and the court; for our part, we intended nothing other than a bona fide consent decree when we suggested, when the parties subsequently agreed to, and when we entered our June 7, 1976 order. Plaintiffs deny vigorously that they intended anything other than a binding consent decree. As for defendants, their "intent" at the time, insofar as that intent was reflected by the attorney who entered into the consent decree, is forever unknowable; a tragic stroke shortly thereafter left counsel, an able young lawyer of exemplary professional character, totally and permanently disabled.

The second problem is that, even if we were to grant the truth of defendants' ini-

tial premise, the conclusion that the consent decree should be *vacated* does not follow. For, defendants are not claiming it was a mutual "mistake" to *enter* the consent decree order, as though we had all intended something different,[15] but that somehow the words "consent decree" slipped inadvertently into the order. Nor are they claiming that they, as defendants, intended something different from what plaintiffs and the court intended.[16] Rather, they are admitting they intended a "consent decree" order to be entered, but that none of us intended for it to have the legal *consequences* they now find it to have. Since that is their argument, it seems to us wholly without logic (to say nothing of legal precedent) to urge vacating the order. It might, logically, call for treating the order in a somewhat different fashion than usual. (We consider at length and ultimately reject this argument in the following section on modifying the decree, pp. 22–24, *infra*). But it cannot possibly justify vacatur. Therefore, defendants' motion to vacate must be denied.

### B. *The Motion to Modify the Decree*

#### 1. *Introduction*

As we have noted, defendants have continued to operate under the more restrictive August 8th, 1976 schedule they unilaterally promulgated. Therefore in pursuing their instant motion to modify the consent decree of June 7th, 1976, which embodies the more expansive visiting schedule of June 4th, 1974, they are in reality seeking, not modification of the schedule under which they are now operating, but rather judicial ratification of the change they implemented in August, 1976. This somewhat confusing procedural posture is exemplified by the proposed schedule in their instant motion to modify, which is identical in every word to the schedule Superintendent Frey implemented August 8, 1976. (*Compare* Defendants' Amended Motion to Modify the Consent Decree, exhibit "A," filed May 16th,

---

**15.** This would be analogous to a contractual "mistake" pointing toward rescission.

**16.** This would be analogous to the "no meeting of the minds" doctrine in contract law pointing toward rescission.

1977, *with* Plaintiffs' Motion to Hold Defendants in Contempt, Exhibit A, filed May 2nd, 1977).

In addressing the motion to modify we must first consider defendants' argument that, in view of the checkered procedural history of this case, the decree before us is less than a bona fide or traditional consent decree, so that conventional standards for modification (which place a heavy burden on the moving party) are inapplicable. As will be seen, we reject that argument. Thereafter, we will then turn to an explication and an application of the traditional standards.

### 2. *Are We Dealing With a Bona Fide or Traditional Consent Decree?*

■ In part III.A. above we set forth, and rejected, defendants' reasons for vacating the consent decree. Their argument for modification is a variant of that argument, and goes essentially as follows: The original stipulation in 1974 was not legally "final" because it was in the context of a dismissal without prejudice under Fed.R.Civ.P. 41(a)(1). Therefore, the plaintiffs' expectation of finality as to that stipulation was "minimal." This minimal expectation of finality persisted, defendants say, for the two years the stipulated schedule was in effect. In July 1976, the minimal expectation was transferred to the consent decree. Since the entry thereof was made at the suggestion of the court, merely, in defendants' view, as a procedural expedient to validate an on-going hearing, and since it was entered during a hearing concerning changes in the visitation schedule, it was entered with the expectation it would be supplanted by a final order at hearing's close. Of course, there was no further "final order" because the hearing was aborted. Therefore no greater expectation of finality attached to the consent decree at the time of its entry than already existed as to the stipulation of dismissal. In sum, the argument concludes, a low expectation of finality attended the stipulation and its aftermath; an equally low expectation attended the consent decree. The result is, in de-

fendants' view, that what we have before us for modification is not a true consent decree at all, but, as we characterized it during the hearing, a "lesser form" of consent decree, one as to which the expectations of finality and the binding effects are minimal. The legal linch pin of defendants' argument is their contention that "a party opposing a Fed.R.Civ.P. 60(b) motion for modification can assert less of an interest in finality where the final judgment, order, or proceeding is a stipulation of dismissal under Fed.R.Civ.P. 41(a)(1) than where it is a consent decree." *Brief in Support of Motion to Modify* at 12–13.

Defendants have cited us to no cases which support this theory, nor has our independent research disclosed any. On reflection, we conclude that defendants' argument suffers three fatal defects. The first involves a mistaken premise that a voluntary motion to dismiss (accompanied by a stipulation) is legally "nonfinal;" the second, an untenable leap from this premise to the conclusion that parties have low expectations of, and interest in, the carrying out of settlement terms which accompany the dismissal; the third, an erroneous assumption that, even if these expectations were low as to a voluntary dismissal, those low expectations could somehow magically be transferred to the ensuing consent decree order.

■ The initial premise is not wholly inaccurate. To be sure, a Fed.R.Civ.P. 41(a)(1) dismissal is not "final" in the sense that, being without prejudice, the plaintiff is free to refile. Similarly, since it does not even require an order, (as for example a Fed.R.Civ.P. 41(a)(2) dismissal does) then by definition it cannot be an "appealable" order, and in that technical sense it is "nonfinal." However, as the Court of Appeals held in this very case, *sub nom. Williams v. Frey,* a Fed.R.Civ.P. 41(a)(1) dismissal *is* "final" for purposes of a 60(b) motion, which requires a "final judgment, order or proceeding." Therefore defendants' initial premise is essentially incorrect.

■ But even if it were correct, the conclusion does not follow that plaintiffs have

a "minimal" expectation as to the binding effect of a settlement agreement which was negotiated for the express purpose of obtaining their consent to dismissal. Quite the contrary, plaintiffs properly had the very highest expectation of such an agreement's being honored in full. The fact that the parties sought court approval of the stipulation of dismissal (with the contact visitation schedule attached) supports this view. Moreover, it may forcefully be argued that the nonprejudicial nature of the dismissal is designed to protect precisely that high expectation, by permitting refiling of the lawsuit if promised terms are not fulfilled, a conclusion diametrically opposed to the one defendants would have us reach about the "nonfinal" nature of a 41(a)(1) dismissal. We read the Court of Appeals' decision in *Williams* to be implicitly based on a similar foundation: that because of the continuing expectations and effects of settlement agreements, courts have the inherent power to re-open voluntary dismissals under rule 60(b).

A considerable line of authority has recognized the justified reliance of parties in their settlement agreements by giving courts the power to re-open cases when such agreements have been breached. As Professor Moore states:

> [W]here the stipulation for dismissal contains conditions agreed to by the parties, such as settlement terms, a court may reinstate the case upon a rule 60(b) motion by either party for purposes of enforcing the settlement . . . "

5 Moore's Federal Practice § 41.17, at 41–229. In *Aro Corporation v. Allied Witan Co.*, 531 F.2d 1368 (6th Cir. 1976), a panel of the Sixth Circuit addressed this issue in the context of a patent infringement suit. Two companies had settled a claim and counterclaim through issuance of a license, whereupon the suit was voluntarily dismissed. The licensee subsequently refused royalty payments, and the licensor moved to have the district court vacate its order of dis-

missal and summarily enjoin the licensee from future nonpayment. The Court of Appeals held that the district court had not only jurisdiction but a duty to vacate its dismissal in order to uphold settlement terms:

> Allied's attempted repudiation of the agreement on which the dismissal rested constituted full justification [for vacatur of the dismissal under F.R.C.P. 60(b)(6)]. The court below had not only the inherent power but, when required in the interests of justice, the duty to enforce the agreement which had settled the dispute pending before it.

531 F.2d at 1371. We agree with the *Aro* Court,[17] and find that defendants had no reasonable basis to expect that plaintiffs or the court would treat the visitation program of the 1974 stipulation as anything other than a commitment necessitating full compliance. Indeed, the fact that the stipulated schedule was adhered to for two years, and that defendants sought the court's permission before making any changes in the schedule even before entry of the consent decree, indicates to us that defendants themselves must have had a very high expectation of the "finality" of the agreed-upon terms.

The third flaw in defendants' theory lies in assuming that whatever the "expectation of finality" following the stipulation to dismiss, the entry of the consent decree in 1976 was anything less than it appeared on its face. When we proposed, and both parties agreed to, the entry of a consent decree, one purpose of our proposal was certainly for procedural "convenience," *i. e.* validation of the pending proceedings. But the very purpose of that "validation" was to create a forum for the motions of a party (in this case the defendants) for modification of the status quo. In a larger sense our proposal was designed to ratify the status the stipulated schedule had come to have after two years in operation. For defendants to now, in effect, collaterally attack the entry of the consent decree on

---

**17.** A separate holding of that court was that there could be summary enforcement of a breached settlement agreement. In the case at bar we have had voluminous hearings, and have no occasion to express a view as to the propriety of summary enforcement.

the grounds they did not "expect" it to be, upon entry, a bona fide consent decree is simply unsupportable.

■ We do not mean to imply, in the paragraphs above, that there are no differences between a settlement agreement preceding a stipulation to dismiss and a consent decree. Indeed there are significant differences. A consent decree is of course a continuing order, one having prospective effect. A party aggrieved by the other party's noncompliance may obtain an order to show cause why the noncomplying party should not be held in contempt, thereby placing on the latter party the burden of proving compliance or excuse from compliance. In contrast, when a settlement agreement made part of a stipulation to dismiss has been breached, the aggrieved party must bear the burden of persuading the court to reopen the matter "in the interests of justice" on a 60(b)(6) motion, as well as subsequently demonstrating that a breach of the settlement terms has occurred. A subsequent order must be obtained enjoining the adversary from noncompliance. Only then will the contempt remedy lie. But absolutely nothing in the distinctions we have drawn above affects our conclusions that: (1) the differences between a consent decree and a stipulated settlement, substantial though they be in terms of enforcement procedure, do not translate into a difference in party, or court, expectations of compliance, which remain equally high in both cases; and (2) that defendants voluntarily consented to the entry of the consent decree in 1976, and therefore voluntarily consented to whatever incremental procedural burdens they suffered from operating under a consent decree as opposed to a stipulated settlement. We are of the opinion, therefore, that what we have before us for modification is a bona fide and traditional consent decree.

3. *The Standard For Modification*

■ We turn now to the case law that instructs us as to the legal standard for granting modification of a consent decree. Most prominent is the recent opinion of *Mayberry v. Maroney,* 558 F.2d 1159 (3d Cir. 1977). *Mayberry,* like the case at bar, involved a consent decree in a prison setting. In that case, the subject of the decree was the practice of confining inmates to a certain basement facility, the Behavior Adjustment Unit (BAU). In 1973 a consent decree enjoined such future confinements. Several years later, the district court, without hearing, granted the prison authorities relief from the judgment. The Third Circuit remanded for a hearing. *Mayberry v. Maroney,* 529 F.2d 332 (3d Cir. 1976). Following that hearing, the district court again granted relief from the decree. The Court of Appeals again reversed the order because the record of the hearing did not demonstrate the requisite evidence for meeting the burden of modification. The Court held that relief from a decree, via either a Fed. R.Civ.P. 60(b)(5) [18] or 60(b)(6) [19] motion, is "extraordinary" and may be granted only upon a showing of "exceptional circumstances." 558 F.2d at 1163. These circumstances include a showing that "extreme" and "unexpected hardship" will result unless relief is granted. *Id.*

The *Mayberry* Court intimated that two policies coalesce to fashion such a high standard. One is that a party has made a "free, calculated, and deliberate choice," *id.,* in the interests of settlement, choosing to incur whatever duties or burdens the decree imposes in order to forego litigation. This value is, of course, identical to the social interest in honoring any legal arms-length contractual choice by two parties, and is based upon upholding the opposing party's justified expectation that a bargain freely entered into will be honored. The second value stems from the fact that the parties, rather than merely memorializing their bar-

18. Rule 60(b)(5) provides for relief when " . . . it is no longer equitable that the judgment should have prospective application."

19. Rule 60(b)(6) provides for relief " . . . for any other reason justifying relief from the operation of the judgment."

gain in a private contract, have invoked the machinery of the judiciary by having a consent judgment entered. "[T]he only issue before this Court is whether the Commonwealth offered sufficient evidence of circumstances so exceptional that *our* overriding interest in the finality and repose of judgments may properly be overcome." *Id.* at 1164 (emphasis supplied). We interpret that language as reflecting a value wholly separate from that of party expectations as to the upholding of private bargains. It reflects a value, important to the integrity of the judicial system, that final judgments under Rule 60 are not granted lightly or whimsically, and carry a strong presumption of stability.

### 4. *Application of the Modification Standard*

Although *Mayberry* made clear the standard a party seeking modification must achieve, it does not instruct us on application of that standard, for in that case the Court of Appeals found *no* credible evidence warranting relief: the prison's new limitation on use of the facility was spurious—an artificially-created "change"; and, the testimony that use of the facility was "essential" to the prison after the consent decree was meaningless, because it was not shown the facility wasn't equally "essential" before the decree. In other words, no "change" in prison need for the facility had been demonstrated. Therefore both lines of evidence relied upon by the district court as justifying relief were wholly without probative value.

In the case at bar, in contrast, some credible evidence has been adduced: specifically, some incidents of population increase, of contraband, of cost factors, and of inequalities in implementation of the visiting schedule. However, since defendants did not show any of these to be unforeseen at the time they entered into the stipulation, or later into the consent decree, and inasmuch as the *Mayberry* standard requires an "unexpected" hardship to result from failure to obtain relief, defendants cannot satisfy the first prong of *Mayberry's* standard. But even if they could, they could not satisfy the other prong of *Mayberry's* standard, the conjunctive requirement that the hardship be "extreme."

A conclusion that the hardships of operating under the stipulated schedule are "extreme" simply cannot be supported on this record. As to the first category of evidence, considered on p. 16 *supra*, we found a 64% increase in the prison population over the three year period. This figure, of course, has no real meaning in itself—it only becomes relevant as it translates into increased problems (*i. e.* contraband, hostages) of the kinds discussed below. We found the contact visitation program itself to have increased more slowly than the population. This increase cannot be "extreme" when, as here, defendants have offered no evidence that the population increase would tax the original seven-day-a-week visitation schedule.

As to the second category of evidence, the risk of a hostage incident, we found that no hostages had been taken, nor attempts made to take hostages, during the operation of the contact visitation program.

As to the third category, that of contraband, we found nine incidents over the three year period, three incidents of which involved drugs. Defendants contend this evidence demonstrates that the 1974 contact visitation schedule became "a new prime source of an influx of drugs into the prison." (N.T. 216). In evaluating this evidence, a number of points must be made. First, of the nine incidents, the last two, involving the marijuana oil and the amphetamines, occurred *after* August, 1976, the date defendants modified the visiting schedule to the terms they now wish embodied in a consent decree. Therefore these two incidents are in no way probative of an "influx" of drugs under the 1974 stipulation which would be curtailed by a present decree modification. Quite the contrary, they support the opposite inference that some amount of drug activity will continue under defendants' proposed visitation program. It seems to us ironic that defendants, and not plaintiffs, introduced these items. Con-

sideration of the above leads us to the conclusion that the probative evidence of a drug "influx" *caused by* the consent decree schedule could only have occurred while that schedule was in effect—namely from October 1974 to August 1976. During that period, the evidence revealed seven contraband incidents, of which only one involved drugs. One incident, in the context of tens of thousands of visits, is hardly evidence of an "influx of drugs."

█ As we further analyze the seven total incidents of contraband, their magnitude continues to diminish. Defendants are not, in the instant motion, proposing to eliminate contact visitation entirely, which would of course eliminate completely the contraband resulting from contact visitation. Rather, they are proposing to reduce the hours by approximately one half, and shift the bulk of the visiting time to weekends. This leads in turn to two possibilities. One is that cutting in half the visiting hours will cut in half the number of contact visits and hence cut in half the amount of contraband. If this course eventuated, it would mean, based on past statistics, eliminating 8,125 visits per year (half the visits per year between 1974 and 1976 hypothesized above)[20] in order to achieve a reduction of 3½ contraband incidents per year and only "half" a drug-related incident per year. When we remember that at least half of those 8,125 visits, and possibly many more involve pre-trial detainees who are constitutionally entitled to the maximum permissible number of visits consistent with prison administration, such a reduction would appear to be a very small saving in security at a tremendous price.[21] The other possibility is that, although the number of *hours* are to be cut in half by defendants' instant motion, there will be no reduction in contact *visits* because the bulk of visiting time will be on weekends, when more families are available to visit. In fact defendants' evidence tends to support this latter alternative.[22] Since each visit presents an

20. See n. 11 *supra*.

21. Approximately half the inmates at the prison are pre-trial detainees, which would lead one to suppose that half the visits would involve detainees. However, this is probably not true. Dr. Nagel testified there is reason to believe pre-trial detainees have a disproportionate share of visits:

> When you are serving a sentence for any length of time you can work out a visiting schedule. You know that the person is going to be there for two years or three years and so you work out a visiting schedule that is most convenient for you to come on the third Sunday or third Tuesday. However, in a situation where so many of your people are in and out, as is the case of an untried individual, the immediacy of the visit is determined by what day he arrives here. When an individual comes into an institution for the untried he has a multitude of immediate problems that have already been resolved when he is in an institution for the convicted. Included in that multitude of problems are such things as what happened to my car that I left at such and such a street. What happened to my clothes at my apartment. How about my job. So generally there is almost an urgency of visits that occurs for the untried that does not occur for the tried. That is probably one of the reasons why it is more urgent to have visits every day of the week than it might be for convicted felons.

No evidence was introduced as to the actual percentage of visits made to pre-trial as opposed to sentenced prisoners.

22. On first examination of the two schedules, it would seem probable that the number of visits would have declined under the August 1976 schedule. After all, sentenced prisoners' allotted time dropped from 9½ to 4 hours per week, and unsentenced prisoners from 9½ to 8½ hours per week. More importantly, each group could receive visits on four days under the old schedule, which included the weekend; under the new schedule, only weekend days were used for visiting.

The sparse creditable data on this issue that was introduced at hearing suggests the decline in visits may have been small or non-existent. During five months, from January–May, 1976, under the more liberal stipulated schedule, there were the following average visits per inmate per month (calculated by dividing the average daily population into the total monthly visits):

| 1976 | |
|---|---|
| January | 4.98 |
| February | 5.15 |
| March | 5.15 |
| April | 7.30 |
| May | 8.9 |

During the same five months of the following year, after the new more restrictive schedule had been put into effect, the comparison figures were:

opportunity for the exchange of contraband, if this course eventuated there would be virtually the same opportunity for such exchange as there was before modification—and we should expect the same number of actual incidents of contraband to be present. Therefore the proposed modification would not achieve *any* decrease in contraband incidents while it would mean reducing by half the time for visits and the days of the week on which visits could occur.

In sum, we conclude that as to the evidence of contraband: (a) the amount of total contraband attributable to the 1974 stipulated schedule, and the sub-class of that total amount which was "drug" contraband, does not constitute an "extreme" changed circumstance within *Mayberry's* standard. Indeed, the record evidence would not meet a burden much less onerous than *Mayberry's*. In so concluding, we are fully cognizant of the tremendous problems contraband causes in prison, and we realize that what seems like a small sum of money or a small amount of drugs on the outside takes on vastly greater dimensions inside prison walls; (b) under defendants' proposed modification the amount of contraband incidents are not likely to be reduced to any significant extent; and (c) if the incidents were to be reduced, it would be at an inordinately high price in terms of constitutionally-protected visiting rights of pre-trial detainees. We rescribe in this regard our factual finding on p. 18 *supra* that less restrictive measures for curtailing contraband are available and are not being utilized.

| 1977 | |
| ------ | ------ |
| January | 4.54 |
| February | 4.6 |
| March | 4.56 |
| April | 4.62 |
| May | 5.06 |

Three of the months from 1976 and all five from 1977 are very close. It is April and May of 1976 that seem to have sudden spurts in visiting. This might be explained by many factors *other* than the differences between the two schedules. For example, it was during this period that the prison for the first time was reaching sudden new population increases. *See* Exhibit D–13. If those increases were

In regard to the evidence of adverse impact of the contact visitation program on "rehabilitation" programs, we found this whole line of evidence to be based on a faulty premise. (*See* p. 18 *supra*). We now elaborate on that finding. Mr. Guarini testified that increased popularity of the contact visitation program had caused decreased interest in the remedial educational program. Assuming, for the purposes of argument, that there really has been a causal relation between these events, we suggest that the two programs cannot meaningfully be weighed side by side. The declining rehabilitation programs to which Mr. Guarini referred are presumably only for sentenced prisoners, since they are the only ones in need of "rehabilitation." Yet it is the pre-trial detainees whose constitutional rights may be abridged by cutting back on visitation hours. By asking us to balance the impairment of rehabilitation programs for sentenced prisoners against the prejudice to the constitutionally-protected rights of pre-trial detainees, defendants are asking us to compare apples and oranges. But even if they could be compared, it seems fallacious to seek to contrast the declining "rehabilitative" programs with the contact visitation, when, by defendants' own admission, a major reason for initially conferring on sentenced prisoners the same visiting privileges that pre-trial detainees enjoyed was precisely because contact visitation "is essential to the *rehabilitation* and *reintegration process* in terms of morale, maintenance of family life and community ties." (Stipulation, June 4th, 1974) (emphasis supplied).[23]

largely pre-trial detainees, as opposed to sentenced prisoners, and if, as Dr. Nagel hypothesized, (n. 21 *supra*) pre-trial detainees receive proportionately more visitors than sentenced prisoners, then one would expect a greater visiting ratio for these months. Unfortunately we cannot confirm the hypothesis of a disproportionate influx of pre-trial detainees, rather than the respective visiting schedules, as being responsible for the variations in number of visits because of the inadequacy of the data.

23. This admission reflects, in part, defendants' awareness of the fact that most of the sentenced prisoners at Delaware County prison are serving relatively short sentences, increas-

Taking defendants' stipulation at its word, a more appropriate way of comparing the educational program losses with the contact visiting program gains might be to say inmates are now opting for more rehabilitation, not less. The validity of this way of viewing the matter is confirmed by Dr. Nagel's testimony that

[T]he first priority most people would put is contact with their wives, girlfriends, and their family. And I think you would find if given the choice between a visit or attending a class or vocational program, or whatever, inevitably the person would choose to visit.

N.T. 267.

As to defendants' fifth category of testimony, the burdensome costs of operating under the stipulated schedule, we earlier found that those costs had not been shown to be unforeseen. At the same time, they do not appear "extreme." We estimated the cost of operating the visiting program every night (which was the aspect challenged by defendants since their proposed schedule, like the stipulated schedule, provides for weekend visiting) to be less than 1% of the current budget. We are not unmindful of the difficulties of running a prison on a budget that is less than the Superintendent feels he needs, and it may well be that under some circumstances a dramatic, unforeseen incursion on a budget could be persuasive evidence as to the necessity for modifying a consent decree. But defendants' showing on the costs of returning to the original contact visitation program seems meager on its face, and defendants did not demonstrate that this additional burden would adversely affect prison functioning.

In sum, neither the increases in the visiting program's popularity, nor the risk of hostages, nor the danger of contraband, nor the decline in the remedial education program, nor the cost factors, can possibly warrant a conclusion of "extreme" hardship, or phrased in *Mayberry's* alternative formulation, of "exceptional circumstances" warranting relief. Therefore defendants' motion to modify the consent decree must be denied. Indeed, we are of the opinion defendants would fail to meet a burden much less exacting than *Mayberry's*. The quantity and quality of evidence adduced would fail to satisfy proof of the need for a schedule change even under a "preponderance of the evidence" standard applicable to civil litigation generally.[24] We turn, then, to plaintiffs' motion for contempt.

ing the importance of reintegration. See n. 5a *supra*.

24. Our denial of defendants' motion for modification means that the original 1974 visitation program will be re-instituted. On pp. 19–21 *supra* we noted the probable need for administrative procedures for the regulation of visiting time and number of visitors on crowded days, and the lack of any mention of such procedures in the 1974 schedule. (The 1976 schedule in contrast, contains a few such explicit procedures). Neither plaintiffs nor defendants have urged, either in motion papers or at oral argument, that the 1974 schedule be interpreted to include any such administrative procedures. Plaintiffs have been wholly silent on this issue; defendants have not moved that, if we order a return to the 1974 schedule, we amend that schedule to include specific administrative procedures to distribute equally visits among inmates. In the absence thereof, we have not fashioned such a remedy of our own motion. Our reasons for not doing so are as follows. First, it is not certain that the problem we envision will occur. It appears prudent to await the actual implementation of the 1974 schedule to see whether such a problem in fact arises, and if it does, what its magnitude is. Second, it appears that no court order is initially necessary to deal with this problem if it does arise. The 1974 consent decree contains no language preventing prison officials at the Delaware County Prison from insuring that visits are distributed in a fair manner. Rather, the decree is silent on the subject. Prison administrators obviously have some inherent authority to take certain administrative actions to insure that contact visitation, or any other program undertaken at their prison, leads to continued high prisoner morale. The issue, then, is the scope of that authority. To what extent, in re-implementing the 1974 schedule, can the prison administration fashion rules to insure that visiting time is distributed fairly? This issue, in the present posture of the case, is simply not ripe for adjudication, and will not become ripe until an actual problem arises and the prison officials respond to it in some fashion. We add that, if problems of maldistribution of visits do arise in re-implementing the 1974 schedule, we urge plaintiffs and defendants to negotiate with a view to alleviating or

## IV. *Plaintiff's Motion to Hold Defendants in Contempt*

### A. *Introduction*

 Plaintiffs have moved for a civil contempt remedy. As plaintiffs acknowledge, such a remedy has two possible foci: to coerce the non-complying party into complying and to compensate his adversary for losses suffered as a result of noncompliance. In our view, the coercive rationale for civil contempt has no applicability in this case at present: we have every expectation that defendants will, pursuant to the order denying their motions to vacate and modify which accompanies this opinion, forthwith re-institute the 1974 stipulated visiting schedule. Indeed, defendants themselves have stated they will consider this order "final," as opposed to what they consider the "interlocutory" character of the previous consent decree order. Adding a coercive contempt order at this juncture would be wholly unwarranted, especially given defendants' record of solicitousness for the court.

That leaves the possibility of awarding monetary relief to compensate plaintiffs for injuries sustained by being wrongfully denied visiting privileges in accordance with the stipulated visiting schedule. Plaintiffs believe they have sustained such injury. They argue that the Third Circuit's decision in this case, *Williams v. Frey,* restored and ratified our order converting the stipulated schedule into a consent decree, and that defendants had a duty to return to the terms of that schedule as of the date of the *Williams* decision, March 31, 1977. In their view, then, injury began on that date and has continued to the present, and is measured by the difference between visitation under the new and old schedules. They further argue that defendants' only possible defenses to a contempt remedy—that the underlying order was invalid, or that there was not a bona fide consent decree in existence—were laid to rest by the Third Circuit's opinion in this case.

### B. *Findings of Fact*

Three plaintiffs testified as to visiting conditions under the prison's new visiting schedule. Thomas Tucker was a sentenced inmate. He had been a prisoner between February 1974 and February 1975, and from June 1976 to June 1977, and therefore presumably had experience both under the stipulated and the new visiting schedules. We credit Mr. Tucker's testimony that he received visits once a week, and that on the average most prisoners experienced this rate of visiting. Although Mr. Tucker testified that transportation and babysitting arrangements were problems for his visitors, he did not state or even imply that he would have had an increased *number* of visits under the old schedule. Rather Mr. Tucker stated that the problems under the new schedule were "more overcrowding" and "less time per visit for each inmate." (June 13, 1977 N.T. 13). In support of the latter, Mr. Tucker stated his observation that cars of visitors were delayed at the prison gate, and not let in until after the visiting hour had in fact begun. We credit the testimony, but as will be seen in the Discussion section, question its relevance to proving injury. We further credit testimony that his own visits lasted 45–55 minutes each period. As to Mr. Tucker's claim of overcrowding, there was no testimony by him to support this contention which would indicate either how "overcrowded" the visiting conditions were or the extent to which his visits had been impaired by such conditions. In the absence thereof, we cannot make a finding that Mr. Tucker's visits under the new schedule were impinged upon by overcrowded conditions.

Frank Metzger had been at the Delaware County Prison since April, 1976. At the time of our hearing he was awaiting sentencing. He did not testify as to how often he received contact visits, or indeed whether he received them at all. He did testify,

---

eliminating them. There are a variety of possible means to do this, including limiting the number of visits or visitors or the length of visits at certain times and under certain conditions. If the problems develop and become sufficiently aggravated, then an aggrieved party might be in a position to apply to us for relief.

and we credit the testimony, that he received specially scheduled visits from his wife, who was a prisoner in the women's section of the same prison. Mr. Metzger testified that the periods of visits had been getting shorter for the men generally, diminishing from an hour to 50 minutes and then 45 minutes per visit. He further testified the men "grumbled and there is a certain amount of unrest and frustration which the men exhibit from these." (*Id.* at 27). We credit his reporting of these matters, but as will be seen in the Discussion, p. 33 *infra*, also question whether they have any relevance to the instant motion.

Plaintiffs' final witness was Dennis McGoff. He had been a prisoner since October, 1976. He testified he was sentenced in April, 1977, but there was no testimony as to whether he had been convicted before or after March 31, 1977, the date of *Williams*. We credit his testimony that he received one visit a week. We further credit his testimony that his visits lasted on the average 45 minutes. Finally, we credit his testimony that he has observed from his cell that it takes a fairly long period of time for cars to be admitted onto the prison grounds, to park, for visitors to come into the visiting area, and for contact visiting to start, and that the actual visits could be longer if these procedures did not take so much time.

All three of these inmates acknowledged that they were sentenced by June 13, 1977, the date of hearing. There is no evidence of record to indicate the date on which they respectively changed from "pre-trial" to "convicted" status—whether it was before or after March 31, 1977, the date of *Williams v. Frey*. Therefore, we cannot find that any of the three were pre-trial detainees at any time after the Court of Appeals re-instituted the consent decree order.

## C. *Discussion*

### 1. *The Elements of Civil Contempt for Monetary Damages*

The most thoughtful examination of the civil contempt remedy for money damages we have located is Judge Magruder's opinion in *Parker v. United States*, 153 F.2d 66 (1st Cir. 1946). Judge Magruder wrote:

Proceedings in civil contempt are between the original parties . . . the real purpose of the court order is purely remedial— . . . to compensate complainant for loss caused by respondent's disobedience of such a decree. . . If a compensatory fine is imposed, the purpose again is remedial, to make reparation to a complainant injured by respondent's disobedience of a court decree. While respondent may be confined to coerce payment of the compensatory fine, he must be released if he pays the fine or shows his utter inability to do so—confinement beyond that point would be punitive, not remedial. If complainant makes a showing that respondent has disobeyed a decree in complainant's favor and that damages have resulted to complainant thereby, complainant is entitled as of right to an order in civil contempt imposing a compensatory fine. . . . The court has no discretion to withhold the appropriate remedial order. In this respect the situation is unlike that of criminal contempt where the court in its discretion may withhold punishment for the past act of disobedience. An order imposing a compensatory fine in a civil contempt proceeding is thus somewhat analogous to a tort judgment for damages caused by wrongful conduct.

153 F.2d at 70.

We distill from this language four elements necessary before plaintiff can recover: (a) plaintiff must show the existence of a valid decree of which defendants had actual or constructive knowledge; (b) plaintiffs must show the decree was "in their favor"; (c) plaintiffs must show that defendants by their conduct violated the terms of the decree, and had knowledge of such violation (the word "disobeyed" above connotes at least constructive knowledge); and (d) plaintiffs must show they have suffered damages as a result. We agree with the First Circuit that when such a showing has been made, the court no longer has the same latitude of "discretion" to withhold a civil contempt sanction that exists in a

criminal context, where the primary purpose is to vindicate the public's right and the court's authority, and not, as here, to compensate an injured party.

## 2. Application of the Legal Standard: Existence of a Valid Decree in Plaintiff's Favor and Knowing Violation by Defendants

As to the first three of the above elements, plaintiffs have clearly met their burden: there is no question but that there is a valid consent decree which defendants knew or should have known was enforceable by the contempt remedy, that plaintiffs benefited by the terms of that decree, and that defendants knew or should have known their conduct was in violation of the decree. Before finalizing those conclusions, we address the two arguments that defendants have put forth by way of defense to these aspects of the contempt remedy: (1) the Court of Appeals' decision in *Williams v. Frey* left open the question whether the consent decree was an "interlocutory" consent decree (without contempt sanction) or was rather a conventional consent decree punishable by contempt (in defendants' view, the Court of Appeals merely determined that a valid consent decree order had been entered, but did not determine the *nature* of that consent decree); and (2) defendants did not "intend" to violate the consent decree, and therefore should not be held in contempt because they entertained a good-faith belief that the consent decree order was merely "interlocutory," one that did not carry with it a contempt sanction.

As to the first defense, we point defendants to the following language in *Williams v. Frey*:

For defendants to be held in contempt, however, it must be shown that they have failed to perform an act commanded by the court. . . . Even though the Stipulation, which dismissed the suit, was approved by the court, it is not a command of which defendants can be held in contempt. On the other hand, defendants may be held in contempt of a consent decree. Thus, Williams sustained a cognizable loss by virtue of the provision of the July 23 order which vacated the earlier order that the Stipulation be considered a consent decree.

551 F.2d at 934.

We believe that passage is susceptible to only one interpretation: Williams had standing because he suffered a loss, and the loss was the incremental contempt remedy which exists as to the consent decree order at issue, but not as to the original stipulation of dismissal. Defendants can put no reliance on a theory that the Third Circuit left open the possibility that the instant consent decree was somehow different from other consent decrees.

As to the second defense, we are sympathetic to defendants' assurance that they never intended to violate a final order of this court. Indeed, if intent were at the heart of this motion we would have to take cognizance of significant mitigating circumstances. First, through the three years of this lawsuit, defendants, with the exception of the order at issue in the present contempt motion, have acted with the utmost consideration and respect for the court and its orders. Second, defendants specifically relied upon an order of this court in implementing the new visiting schedule. *See* Superintendent Frey's Memorandum of August 2, 1976, Exhibit A to the contempt motion. Third, defendants continued to rely on that order for eight months—until March 31, 1977, when the Court of Appeals vacated the order. Fourth, within a month and a half after that vacating, and within two weeks after plaintiffs moved to hold them in contempt, defendants countered with an extensive motion to vacate or modify the decree. Fifth, we believe defendants have indeed held a good faith, though woefully mistaken, belief in the "interlocutory" nature of the consent decree order at issue. Sixth, defendants are the administrators of a large county institution which necessarily needs extensive time to plan for any changes to be implemented. These factors make it arguable that they did not "intentionally" seek to violate our decree by seeking to vacate or modify that decree while

continuing under the revised visiting schedule pendente lite. And were this a motion for criminal contempt, these factors would probably persuade us there had been no intentional defiance of court order which required sanctions either for the public's good or the court's authority.

 However, "intent" is clearly not a requirement for civil contempt. "The absence of wilfulness does not relieve from civil contempt. . . . Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Therefore, to the extent defendants are asserting a "good-faith" belief, we must conclude that it is legally irrelevant. And to the extent defendants are asserting that *none* of the parties "intended" the consent decree to have the effect of a bona fide consent decree, they assert an argument we have already rejected as a reason for vacating or modifying the consent decree, (see p. 16 *supra*) and which we must reject for the same reasons in this context.

We conclude defendants have asserted no viable defenses as to the first three elements of the contempt remedy.

### 3. *Application of the Legal Standard: Damages*

The fourth element which must be established is, in the words of *Parker v. United States, supra,* that "damages have resulted to complainant thereby." We of course cannot assume such damages, and there are no applicable presumptions of which we are aware. Before addressing the issue of damages, however, there is a troublesome issue raised by the unique procedural history of this case: were relief to be granted, who would be entitled to recover? The order certifying a class of pre-trial detainees was entered on May 4, 1977, prior to the second hearing. On that date there were no viable plaintiffs of record (the named plaintiffs having left the prison, there being no class action, and no interventions). However, *Williams v. Frey* taught us once before that the case was not moot or dismissable in

such a posture, especially since there was a valid consent decree in existence.

On May 4, 1977, we permitted intervention of seven new plaintiffs, and certified a class action on behalf of the class of pre-trial detainees. (Both pre-trial detainees and sentenced prisoners have equal, though different, rights under the consent decree). Of the seven intervened plaintiffs, the motion papers represented that four were pre-trial detainees, while three were sentenced prisoners. At the hearing on June 13, 1977, it became clear that one of the supposed detainees was in reality a sentenced prisoner (Metzger). The other three supposed detainees did not testify, and we have no knowledge as to their actual status. In addition, at that hearing we permitted intervention of Ronald Townes, who was a pre-trial detainee. However, Townes did not thereafter testify. As we described in the fact-findings section, only three plaintiffs actually testified; all of them were sentenced or convicted at the time of hearing. And, as we earlier found, there were no facts on which we could conclude the three had not been convicted as of March 31, 1977, the date of the Court of Appeals opinion in *Williams v. Frey.*

We would seem logically to have a number of alternatives: (a) to grant damage relief only to the three sentenced or convicted prisoners who testified; (b) to grant damage relief to the other plaintiffs of record; (c) to grant damage relief to the certified class of pre-trial detainees; (d) to grant damage relief to all the sentenced or convicted prisoners who have rights under the consent decree enforceable by *Williams v. Frey* but who have not been certified as a class.

Plaintiffs' contempt motion papers are ambiguous as to which of these possibilities they are seeking. While the contempt motion at ¶ 4 refers to "plaintiffs and those inmates similarly situated," raising the possibility of prison-wide relief (possibility (d) above), the motion also states at ¶ 5: "Defendants' failure or refusal to provide the visits *to plaintiffs* . . . is a Contempt of Court," suggesting the only relief sought

is for the intervenors themselves. Moreover, plaintiffs' brief states, "[t]estimony in this matter by inmates and their expert witnesses indicate the losses suffered *by Plaintiffs*. These losses and expenses incurred to enforce compliance are recoverable." We construe plaintiffs' motion to be seeking relief only for the intervenors of record, and not for the entire prison population.

Frankly, we do not see any other possibility. No one testified from the certified class of pre-trial detainees, although Ronald Townes had just been intervened that day. There was no data on which a finding could be made that the three testifying plaintiffs had enjoyed pre-trial detainee status at any point after March 31, 1977, the date of the Third Circuit's opinion in *Williams v. Frey*. Accordingly, there is no basis on which to justify class-wide damage relief to pre-trial detainees. And the sentenced intervenors cannot represent anyone but themselves since there is no class of sentenced prisoners.[25] The testifying intervenors cannot of course speak for, or have their testimony attributed to, the non-testifying intervenors, whether sentenced or pre-trial. We see no alternative but that damages, if they exist, will be personal to the three intervenors who testified, Messrs. Tucker, Metzger, and McGoff, none of whom were pre-trial detainees.

As to the existence of injury sustained by these three inmates there was a total failure of proof. Mr. Tucker, significantly, did *not* testify he had been deprived of, and thereby injured by, the decreased number of contact *visits* he had received, or the number of *visitors* he had seen. Both of those might be logical suppositions about the effect of defendants' actions. After all, if defendants had returned to the stipulated schedule on March 31, 1977, Mr. Tucker would have received 9½ hours visiting per week, spread over four days. By continuing to operate under the August, 1976 schedule, Mr. Tucker could receive only four hours per week maximum, spread over two days. Moreover, Mr. Tucker could only re-ceive three visitors per visit, rather than six of the stipulated schedule. However, Mr. Tucker did not claim injury by virtue of any of this. As to the first of the two claims he did make—that of overcrowded conditions—we could not find overcrowded conditions as a fact since there was absolutely no testimony or other evidence to support it other than the one-word allegation.

As to Mr. Tucker's second complaint, that cars were admitted late into the prison yard, there is no indication this situation would have been ameliorated by virtue of returning to the stipulated schedule. Inasmuch as his observation speaks to administrative procedure that would seem to be necessary under either visiting schedule and inasmuch as Mr. Tucker did not testify that the same processing delays did not go on under the old schedule, we cannot determine his testimony to be evidence of injury sustained by Mr. Tucker as a result of defendant's failure to implement the stipulated schedule. Moreover, under both schedules, the maximum visiting time possible per period for sentenced inmates is identical—two hours on each visiting day. Thus it is impossible to infer that the vehicular delay impacted more strongly under the August, 1976 schedule than it would have under the stipulated 1974 schedule. In short, there is no evidence of injury or damages to Mr. Tucker on which a contempt award could be based.

Mr. Metzger did not testify he received any visits at all under the contact visitation schedule. His testimony focused exclusively on "grumblings," "unrest" and "frustration" he heard from other inmates. Since we have determined that we cannot make an award to anyone but testifying plaintiffs, his perceptions of other inmates' grievances, even were they of sufficient certainty to support a damage award, are legally irrelevant to this contempt award.

Mr. McGoff's testimony was very similar to Mr. Tucker's. Both men received visits longer than the half-hour minimums set out in the 1976 schedule. During a two-hour

---

**25.** But see n. 24 *supra*.

allotted visiting period, they each received visits of between 45 minutes and one hour. There is no basis on which we can rationally conclude that had the 1974 schedule been re-implemented on March 31, 1977, or soon thereafter, either Tucker's or McGoff's weekly visit during the same two hour allotted period would have been longer than this. Certainly neither man testified, nor was there any other form of evidence to suggest that the average visit for sentenced prisoners under the 1974 schedule had been longer than 45 minutes to an hour.

We therefore conclude none of the plaintiffs met their burdens as to the element of proving damages to themselves that was attributable to the failure to re-implement the stipulated visiting schedule.[26] Accordingly, plaintiffs' motion for contempt must be denied.

An appropriate Order follows.

---

**26.** No other data was introduced at the hearing which would permit a finding of injury to inmates other than Tucker, Metzger and McGoff. Hence, even if we are incorrect in concluding above, pp. 32–33 *supra,* that no one other than the three who testified would be entitled to recover, there is no record evidence to permit either a calculation or distribution of damages to any other inmate.