## UNITED STATES *v.* UNITED SHOE MACHINERY CORP.

No. 597. Argued April 1, 1968.—Decided May 20, 1968.

*Assistant Attorney General Turner* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Francis X. Beytagh, Jr., Howard E. Shapiro, Thomas R. Asher,* and *Margaret H. Brass.*

*Ralph M. Carson* argued the cause for appellee. With him on the brief were *Conrad W. Oberdorfer, Robert D. Salinger, Lloyd N. Cutler, Taggart Whipple,* and *Louis L. Stanton, Jr.*

*James F. Rill, John R. Hally,* and *Thomas F. Shannon* filed a brief for the National Footwear Manufacturers Association, Inc., et al., as *amici curiae,* urging affirmance.

MR. JUSTICE FORTAS delivered the opinion of the Court.

In 1953, in a civil suit brought by the United States, the District Court for the District of Massachusetts held that appellee had violated § 2 of the Sherman Antitrust Act by monopolizing the manufacture of shoe machinery. The court found that "(1) defendant has, and exercises, such overwhelming strength in the shoe machinery market that it controls that market, (2) this strength excludes some potential, and limits some actual, competition, and (3) this strength is not attributable solely to defendant's ability, economies of scale, research, natural advantages, and adaptation to inevitable economic laws." *United States* v. *United Shoe Machinery Corp.,* 110 F. Supp. 295, 343 (1953). The court did

not order the relief requested by the Government—that appellee be dissolved into three separate shoe machinery manufacturing companies. Rather, the court imposed a variety of restrictions and conditions designed "to recreate a competitive market."[1] Appellee appealed to this Court, which affirmed the decision of the District Court. *United Shoe Machinery Corp.* v. *United States,* 347 U. S. 521 (1954).

The decree of the District Court, entered on February 18, 1953, and subsequently modified on July 12 and September 17, 1954, provided in paragraph 18 that:

> "On [January 1, 1965] both parties shall report to this Court the effect of this decree, and may then petition for its modification, in view of its effect in establishing workable competition. If either party takes advantage of this paragraph by filing a petition, each such petition shall be accompanied by affidavits setting forth the then structure of the shoe machinery market and defendant's power within that market." 110 F. Supp., at 354.

---

[1] Some of the major provisions of the decree were as follows: United was enjoined from further monopolization; it was ordered to offer for sale all types of machines (previously only leased) at "such terms . . . as do not make it substantially more advantageous for a shoe factory to lease rather than to buy a machine"; if United continued leasing it was required to lease for no more than five-year terms under certain specified conditions; it was not to refuse a prospective customer's request to lease or buy a machine "except for good cause"; it was to submit a plan for disposing of certain sectors of its business; it was to grant to any applicant, except a deliberate infringer, a nonexclusive license under any or all patents held by it on reasonable nondiscriminatory royalty terms; it was not to acquire any patents or patent applications except those acquired by reason of bona fide employment of the inventor, nor was it to acquire patents or patent applications under exclusive license; it was not to acquire any second-hand shoe machinery or any shoe machinery manufacturer or a manufacturer or distributor of supplies for shoe factories.

Pursuant to this provision, the Government reported to the District Court on January 1, 1965, that appellee continued to dominate the shoe machinery market, that workable competition had not been established in that market, and that additional relief was accordingly necessary. The Government asked that appellee be required to submit to the Court a plan, pursuant to which United's business would be reconstituted so as to form two fully competing companies in the shoe machinery market. It also requested "such other and further relief as may be necessary to establish workable competition in the shoe machinery market."

The District Court, after a hearing, denied the Government's petition.[2] It held that under *United States* v. *Swift & Co.*, 286 U. S. 106 (1932), its power to modify the original decree was limited to cases involving "(1) a clear showing of (2) grievous wrong (3) evoked by new and unforeseen conditions." *United States* v. *United Shoe Machinery Corp.*, 266 F. Supp. 328, 330 (1967). Analyzing its 1953 decree, as amended, the court said that the object of the decree was "not to restore so-called workable competition but to move toward establishing it," and that "the 1953 decree has operated in the manner and with the effect intended. It has put in motion forces which, aided by new technology, have eroded United's power and already dissipated much of the effect of United's monopolization." 266 F. Supp., at 330, 334. Accordingly, in view of the stringent requirements of *Swift* as the court construed that decision, the District Court denied the Government's petition.

From this decision the Government appealed to this Court. We noted probable jurisdiction. 389 U. S. 967 (1967). We reverse.

---

[2] A petition by appellee, seeking to be relieved of certain restrictions contained in the original decree, was similarly denied. The judgment in this regard is not before us, since appellee has not appealed to this Court.

## I.

The District Court misconceived the thrust of this Court's decision in *Swift*. That case in no way restricts the District Court's power to grant the relief requested by the Government in the present case. In *Swift,* a consent decree had been entered in 1920 ordering a measure of divestiture by and imposing a variety of restraints upon the defendant meat packers. In 1930, after various unsuccessful attempts to secure modification or vacation of the decree, the packers filed a petition "to modify the consent decree and to adapt its restraints to the needs of a new day," as Justice Cardozo phrased it. 286 U. S., at 113. The lower court granted a measure of relief and the United States appealed. This Court reversed. It emphasized the power of a court of equity "to modify an injunction in adaptation to changed conditions though it was entered by consent." *Id.,* at 114. The question, it held, is "whether enough has been shown to justify its exercise." *Id.,* at 115. After reviewing the evidence, the Court concluded that the danger of monopoly and of the elimination of competition which led to the initial government complaint and the decree had not been removed and that, although in some respects the decree had been effectuated, there was still a danger of unlawful restraints of trade. The Court's language, quoted and relied on by the trial court here, to the effect that "nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change," *id.,* at 119, the decree, must, of course, be read in light of this context. *Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may *not* be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved.

The present case is the obverse of the situation in *Swift* if the Government's allegations are proved. Here, the Government claims that the provisions of the decree were specifically designed to achieve the establishment of "workable competition" by various means and that the decree has failed to accomplish this result. Because time and experience have demonstrated this fact, according to the Government, it seeks modification of the decree. Nothing in *Swift* precludes this. In *Swift,* the defendants sought relief not to achieve the purposes of the provisions of the decree, but to escape their impact. Accordingly, we conclude that the District Court erred in denying the Government's petition "on the authority of United States v. Swift & Co., 286 U. S. 106, 119." 266 F. Supp., at 334.

## II.

Decision as to the Government's petition to modify the decree in the present case must be based upon the specific facts and circumstances that are presented. In urging affirmance of the 1953 decision, the Government advised this Court that, in framing the decree, the District Court had "proceeded on the premise that relatively mild remedies should be tried as a first resort, and that the possibility of more drastic measures should be held in abeyance." Brief of the United States, No. 394, 1953 Term, 155. Paragraph 18 of the decree appeared to be in confirmation of this statement since it expressly required a report after 10 years of experience under the decree and contemplated that petitions for modification might be filed "in view of [the decree's] effect in establishing workable competition." Paragraph 18 then specifically provided that any such petition would have to be accompanied by "affidavits setting forth the then

structure of the shoe machinery market and defendant's power within that market." [3]

These specifications were peculiarly apt because this is a monopoly case under § 2 of the Sherman Act and because the decree was shaped in response to findings of monopolization of the shoe machinery market. That the purpose of the 1953 decree was to eliminate this unlawful market domination was made clear beyond question by the District Court's statement at the beginning of the section of its opinion dealing with relief. This read as follows:

> "Where a defendant has monopolized commerce in violation of § 2, the principal objects of the decrees are to extirpate practices that have caused or may hereafter cause monopolization, and to restore workable competition in the market." 110 F. Supp., at 346–347.

It is of course established that, in a § 2 case, upon appropriate findings of violation, it is the duty of the court to prescribe relief which will terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future. See, e. g., *United States* v. *Grinnell Corp.,* 384 U. S. 563, 577 (1966); *Schine Theatres* v. *United States,* 334 U. S. 110, 128–129 (1948). The trial court is charged with inescapable responsibility to achieve this objective, although it may, if circumstances warrant, accept a formula for achieving the result by means less drastic than

---

[3] In paragraph 23 of the original decree jurisdiction was expressly retained "for the purpose of enabling either of the parties to apply to this Court at any time for such further orders and directions as may be appropriate for the correction, construction, or carrying out of this Decree, and to set aside the Decree and take further proceedings if future developments justify that course in the appropriate enforcement of the Anti-Trust Act." 110 F. Supp., at 354.

immediate dissolution or divestiture. The decree in the present case was carefully devised within the limits of this principle. Measures short of divestiture were prescribed with provisions for review and possible revision after 10 years.[4]

The District Court has now denied the Government's petition for modification of the decree on the ground that the decree is "still working at its long-range task of freeing the market from all consequences of United's monopolization and keeping the door wide open for the arrival of an adequately provided challenger." 266 F. Supp., at 334. According to the court, this was the intended effect of the decree.

If the decree had not contained paragraph 18—if it had been silent as to the time for submitting reports and, if necessary, petitions for modification—and if after 10 years it were shown that the decree had not achieved the adequate relief to which the Government is entitled in a § 2 case, it would have been the duty of the court to modify the decree so as to assure the complete extirpation of the illegal monopoly. The court's power to do this is clear. See, e. g., *United States* v. *Swift & Co.,* 286 U. S. 106 (1932); *Chrysler Corp.* v. *United States,* 316 U. S. 556 (1942). Its duty is implicit in the findings of violation of § 2 and in the decisions of this Court as to the type of remedy which must be prescribed.

We find nothing in the 1953 decree, as amended, or in the District Court's opinion relating thereto which presents an obstacle or embarrassment to the application of this principle in the present case. If the decree has not, after 10 years, achieved its "principal objects," namely, "to extirpate practices that have caused or may

---

[4] In rejecting the suggestion that United be forbidden to lease on any terms, the District Court stated specifically that it "agrees that it would be undesirable, at least until milder remedies have been tried, to direct United to abolish leasing forthwith." 110 F. Supp., at 349.

hereafter cause monopolization, and to restore workable competition in the market"—the time has come to prescribe other, and if necessary more definitive, means to achieve the result. A decade is enough.[5] Even if we should assume that paragraph 18, as the District Court now states, had only the limited purpose of calling for a 10-year report as to whether the decree was "gradually eroding United's 1953 power to monopolize the market," 266 F. Supp., at 330, its specific provisions did not exhaust the District Court's power. Relief in a Sherman Act case "should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the Act." *United States* v. *Grinnell Corp.*, 384 U. S. 563, 577 (1966). See also *United States* v. *United States Gypsum Co.*, 340 U. S. 76, 88–90 (1950); *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U. S. 316, 326 (1961). The District Court should proceed to determine whether the relief in this case has met the standards which this Court has prescribed. If it has not, the District Court should modify the decree so as to achieve the required result with all appropriate expedition.

*It is so ordered.*

Mr. Justice Marshall took no part in the consideration or decision of this case.

---

[5] We emphasize that there is no issue here regarding the timing of the Government's petition for modification. No claim is made that the Government has petitioned for modification before the running of a reasonable period during which the effects of the original decree have become clear. Moreover, the Government may claim, persuasively, that paragraph 18 of the original decree specifically contemplated that the Government would petition when it did.