Dorothy GAUTREAUX, Odell Jones, Doreatha R. Crenchaw, Eva Rodgers, James Rodgers, and Robert W. Fairfax, Plaintiffs,

v.

Samuel PIERCE, Secretary of the Department of Housing and Urban Development of the United States, Defendant.

No. 66 C 1460.

United States District Court,
N. D. Illinois, E. D.

Jan. 25, 1982.

Alexander Polikoff, Howard A. Learner, Chicago, Ill., for plaintiffs.

Dan K. Webb, U. S. Atty., Robert Grossman, Roan & Grossman, Patrick W. O'Brien, Mayer, Brown & Platt, Richard Flando, Acting Regional Counsel, Gershon M. Ratner, Carolyn B. Lieberman, John W. Herold, Edward G. Weil, Dept. of Housing & Urban Development, Stanley J. Garber, Corp. Counsel, Calvin H. Hall, Gen. Counsel, Chicago Housing Authority, Earl L. Neal, Sp. Asst. Corp. Counsel, Chicago, Ill., Jane McGrew, Gen. Counsel, Dept. of Housing and Urban Development, Washington, D. C., Gerald D. Skoning, Seyfarth,

Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This litigation began in 1966 when plaintiffs, approximately 43,000 black tenants of and applicants for public housing in the Chicago area, brought related actions against the Chicago Housing Authority ("CHA") and the United States Department of Housing and Urban Development ("HUD") alleging that defendants had violated their rights under the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 et seq., and the equal protection clause of the fourteenth amendment. HUD was charged along with CHA with instituting and promoting racially discriminatory policies and practices that resulted in low income housing being built in exclusively black neighborhoods in Chicago and in racial quotas that limited the number of black families in white housing projects. Both HUD and CHA were found liable to the plaintiffs for their respective roles in contributing to Chicago's discriminatory housing patterns,[1] but meaningful relief for the plaintiff class was consistently thwarted through the delay occasioned by innumerable appeals and by defendants' refusal to take appropriate remedial action.

Finally, after more than a decade of intense litigation at all levels of the federal court system, a consent decree was negotiated between the plaintiffs and HUD that purported to encompass a workable plan for delivering long overdue relief to the plaintiff class. As part of the consent decree, which was approved by the Court on June 16, 1981, HUD agreed to provide 7,100 units of assisted housing[2] for the plaintiff class in specified areas of the Chicago Standard Metropolitan Statistical Area through various housing programs administered by HUD designed to stimulate the development of low income housing. An important, if not vital, adjunct to one of these HUD programs (Section 8 New Construction and Substantial Rehabilitation) is the Government National Mortgage Association Tandem Financing program ("GNMA Tandem") through which GNMA, a wholly-owned government corporation, indirectly provides a source of financing for housing development to serve low income persons. GNMA purchases FHA-insured mortgages issued to eligible developers by private lending institutions at below market rates and resells them at current market prices, absorbing the loss as a subsidy. The Reagan Administration has proposed that the GNMA Tandem program be eliminated in fiscal year 1983, however, and this matter is presently before the Court on plaintiffs' motion to enforce or, alternatively, to modify the consent decree in light of the current uncertainty with respect to the future of the Tandem program.

Paragraph 8.1 of the consent decree provides that:

1. A catalogue of the many opinions in these consolidated cases can be found in *Gautreaux v. Landrieu*, 523 F.Supp. 665 (N.D.Ill.1981).

2. Assisted housing is defined in paragraph 2.1 of the consent decree as follows:

2.1 "Assisted housing" means non-elderly housing subsidized by HUD, directly or through a public housing agency, under the following housing programs or under any housing program enacted by Congress or established by HUD in the future for the benefit of poor persons as an addition to or alternative or substitute for such programs: Section 8 Housing Assistance Payments Program— New Construction (24 C.F.R. Part 880), Substantial Rehabilitation (24 C.F.R. Part 881), Existing Housing (24 C.F.R. Part 882, Subparts A and B), Moderate Rehabilitation (24 C.F.R. Part 882, Subparts D and E), State Housing Agencies (24 C.F.R. Part 883) and Special Allocations (known as Loan Management and Property Disposition, 24 C.F.R. Part 886); Public Housing New Construction and Acquisition, with or without rehabilitation (24 C.F.R. Part 841); Rent Supplement (24 C.F.R. Part 215); and Rental Assistance Payments Program (24 C.F.R. Part 236, Subpart D). However, no project or housing units receiving either Rent Supplement or Rental Assistance Payments in whole or in part on or before the "effective date," as defined herein, shall be deemed to be assisted housing under this Decree.

The only program involved in the instant dispute is Section 8 New Construction and Substantial Rehabilitation.

Jurisdiction is retained by the Court for the purpose of enabling the plaintiffs and HUD to apply to the Court at any time for such further orders as may be necessary or appropriate for the construction, implementation, modification or enforcement of this Consent Decree.

For obvious reasons, plaintiffs initially characterize their motion as seeking implementation or enforcement of the decree since their burden in such a context is not as great as it would be if the motion were viewed as seeking modification of the decree. Alternatively, plaintiffs argue that the decree should be modified to require that HUD set aside approximately $324 million of GNMA's fiscal 1982 Tandem appropriation for Section 8 New Construction and Substantial Rehabilitation projects in the Chicago area ("Gautreaux projects") that have already received FHA mortgage commitments and for which section 8 rental subsidies have already been reserved. Defendants maintain that plaintiffs' motion cannot be characterized as seeking enforcement or implementation of the decree and that plaintiffs have not met their burden of showing that the decree should be modified to provide the relief they desire. For the reasons set forth below, plaintiffs' motion will be denied.[3]

■ Plaintiffs' first argument, that the relief they seek may properly be viewed as implementation or enforcement rather than modification of the decree, is not persuasive. Plaintiffs correctly note that HUD undertook to "explore actively all possibilities of supplying assisted housing to eligible persons as rapidly as possible through the assisted housing programs referred to in this Consent Decree." Consent Decree at paragraph 5.9. They then turn to paragraph 8.7 of the consent decree which provides that where HUD has agreed to consider or explore taking any action not specifically required under the decree, HUD must do so in good faith but HUD's failure to actually take the action that it had considered or explored taking shall not be grounds for contempt. Finally, plaintiffs' reason that the limitation of paragraph 8.7 to contempt, taken together with the Court's inherent power to implement or enforce the decree, recognized in the decree itself at paragraph 8.1, must mean that the Court may grant relief other than contempt, such as implementation or enforcement of the decree, when HUD's exploration of avenues of relief under paragraph 5.9 leads it to "an indefensible result."

Even if we accept plaintiffs' interpretation of paragraph 8.7 of the decree, as contemplating relief other than contempt when HUD fails to take action necessary to afford relief under the decree, it does not necessarily follow that the "other" relief plaintiffs seek must be characterized as implementation or enforcement of the decree, particularly when they seek to impose an obligation upon HUD to which it did not expressly agree and, in fact, which it specifically rejected during negotiations leading up to the proposed decree. If plaintiffs had been successful in negotiating a set aside of GNMA Tandem funds into the consent decree as they had attempted to do, then the decree could be enforced to give effect to that obligation imposed upon HUD. Similarly, if HUD should renege on its commitment to set aside contract authority for 150 units of Section 8 Existing Housing each year, then plaintiffs could move to enforce the terms of the decree. But it would be ironic indeed to grant plaintiffs' motion under the guise of enforcing the terms of the decree when plaintiffs themselves were unsuccessful in their attempt to have those terms inserted into the document in the first place. The Court is not free to rewrite the terms of the decree and then enforce

---

**3.** Accordingly, the Court need not address defendants' alternative argument that even if plaintiffs can show that the consent decree should be modified, they are not entitled to the relief they seek because of the statutory bar to an injunction against the property of GNMA or against GNMA with respect to its property contained in 12 U.S.C. § 1723a(a). The Court expresses no view whatsoever with respect to the effect of section 1723a(a) on plaintiffs' request for relief.

the decree as rewritten.[4] In the Court's view, plaintiffs' motion is more appropriately characterized as seeking modification of the decree and we will turn to a discussion of the motion in that context.

A consent decree embodies elements of both a contract and a court order so that a party seeking to modify it faces a rather substantial burden. As the court noted in *McGoff v. Rapone*, 78 F.R.D. 8, 24 (E.D.Pa. 1978), the party opposing modification has a "justified expectation that a bargain freely entered into will be honored." Moreover, the integrity of the judicial system depends to a large extent upon the principle and the perception that final judgments[5] are not granted lightly or whimsically and that they are entitled to a strong presumption of stability. *Id.*, 78 F.R.D. at 25. *See also United States v. ITT Continental Baking Company*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 149 (1975); *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1119–20 (3d Cir. 1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *Mayberry v. Maroney*, 558 F.2d 1159, 1164 (3d Cir. 1977). Nevertheless, the Supreme Court has held that a consent decree may be modified in appropriate circumstances, *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968); *United*

*States v. Swift & Company*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), though lower courts often differ with respect to the phrasing of the standard to be applied in order to determine whether modification is warranted.

A review of the decisions in which courts have considered whether to modify a consent decree, including the most recent decision of the United States Court of Appeals for the Seventh Circuit in *United States v. City of Chicago and Fraternal Order of Police*, 663 F.2d 1354 (1981) (en banc), reveals that, for the most part, courts generally engage in a two-part analysis in determining whether modification of a consent decree is appropriate.[6] As a threshold matter, exceptional circumstances, new, changed or unforeseen at the time the decree was entered, are required in order to justify modification of the decree. Courts then weigh the equities in determining the hardship upon the moving party if modification is not granted and the hardship on the party opposing modification if the Court grants the relief sought as well as the impact of modification upon innocent third parties. An important consideration in connection with this second inquiry into the equities is whether 'the purposes of the litigation as incorporated in the decree' have been fully achieved.[7] *United States v.*

4. Although we agree with the plaintiffs that paragraph 5.9 of the decree evinces HUD's undertaking to attempt to provide relief as rapidly as possible, though not within a definite time frame, we cannot agree that any time the Court or plaintiffs conclude that HUD might do more to provide housing to eligible persons, the Court may force HUD to take such action under the theory that it is enforcing the decree.

5. The consent decree in the instant case was entered as a final judgment on June 29, 1981.

6. *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 660 (1968); *United States v. City of Chicago and Fraternal Order of Police*, Nos. 80–2008, 2146 and 2235 (7th Cir. 1981); *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114 (3d Cir. 1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *DeFilippis v. United States*, 567 F.2d 341 (7th Cir. 1977); *Mayberry v. Maroney*, 558 F.2d 1159 (3d Cir. 1977); *Fox v. Department of Housing and*

*Urban Development*, No. 75–445 (E.D.Pa. November 18, 1981).

7. Courts frequently refer to the need to show grievous wrong as a prerequisite to modification of the decree in reliance upon language to that effect in *United States v. Swift & Company*, 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). But in *United Shoe* and *Fraternal Order of Police*, the Supreme Court and the Seventh Circuit backed away from the "grievous wrong" language of *Swift* in favor of a more flexible balancing of the equities involved together with consideration of whether the purposes of the litigation as incorporated in the decree have been achieved. The grievous wrong concept is subsumed within this inquiry. If a plaintiff can show that modification of the decree is crucial to the effectuation of the purpose the decree was intended to achieve, then a grievous wrong would be perpetrated if the decree was not modified. *See, e.g., United States v. United Shoe Machinery Corp., supra.* Similarly, if the purposes of the consent decree

*United Shoe Machinery Corp., supra; United States v. City of Chicago and Fraternal Order of Police, supra.* Applying these factors the Court must conclude that plaintiffs have not met their burden of showing that the consent decree should be modified at this juncture.

■ As the Seventh Circuit has noted, modification of a previously entered order is "extraordinary relief, and requires a showing of exceptional circumstances." *United States v. City of Chicago and Fraternal Order of Police, supra,* slip op. at 11. In the case at bar, however, there has not been a significant change in circumstances with respect to the GNMA Tandem program since the consent decree was approved by the Court in June, 1981. Moreover, the only change that has occurred since the parties first executed a copy of the proposed decree in December, 1980, is that the continued viability of the Tandem program is in doubt, but the program itself is still functioning in the same way as it did at that time.[8]

As interest rates began to rise dramatically in mid-1980, conventional financing became an increasingly unrealistic alternative for developers of section 8 housing. More and more private developers turned to GNMA Tandem financing as the only way of making their projects financially feasible. While a general supply-demand equilibrium had been maintained during the early years of the GNMA program in 1978 and 1979, demand for Tandem financing had far outstripped the supply by late 1980. In January, 1981, HUD found that the only fair way to allocate the limited GNMA Tandem appropriation was by lottery. Precisely the same conditions exist today, and HUD apparently plans to allocate the fiscal 1982 Tandem funds by lottery this year as well.

■ Plaintiffs contend that a significant change in circumstances has occurred since they originally negotiated the decree because the Reagan Administration has proposed abolishing the GNMA Tandem program in fiscal 1983. However, the initial announcement that the Tandem program might be abolished was made as early as March, 1981, a full three months before the consent decree was entered by the Court in the instant case. As we stated earlier,[9] the relevant date for determining whether a change in circumstances has occurred rendering a modification of the decree necessary to fulfill its purposes is the date upon which the decree is approved and entered by the Court. Before that time, either party is free to attempt to negotiate a change in the agreement should it determine the proposed decree will not have the desired remedial effect. At oral argument on the pending motion, counsel for plaintiffs conceded that while it would have been theoretically possible to come before the Court in March, April, or June of 1981 with regard to the Administration's announced change of position on the future of the

have been fully achieved, a defendant would be grievously wronged if the decree remained unchanged. *See, e.g., United States v. City of Chicago and Fraternal Order of Police, supra.*

8. As a threshold matter, the Court finds that the relevant date for the purpose of determining whether a change in circumstances has, in fact, occurred is June 16, 1981, when the Court approved the consent decree negotiated by the parties. Normally, consent decrees are executed by the parties and approved by the Court within a relatively short period of time. In the instant case, however, the parties first executed a copy of the proposed consent decree in December, 1980, an extended fairness hearing was held in January and February, 1981, and

the Court finally entered an order approving the decree in June, 1981. Any change in circumstances that might have effected the viability of the proposed consent decree that occurred between December, 1980, and June, 1981, could have been brought to the Court's attention and, if necessary, approval of the decree could have been withheld until the decree was changed to accommodate new developments. It would be unrealistic to consider modifying a decree to take account of circumstances that existed before the decree went into effect but which, for whatever reason, were not accommodated at that time.

9. *See* note 8, *supra.*

GNMA program, he chose not to do so at the time.[10]

The fact remains that the future of the GNMA Tandem program was uncertain at the time the consent decree was entered in June, 1981, and the continued existence of the program remains uncertain today.[11] It is entirely possible · that the Administration's proposal to establish the program will be withdrawn or that it will not be honored by Congress in its deliberations on the final 1983 budget. As recently as December 10, 1981, Representative Edward P. Boland (D.Mass.), the Chairman of the House Subcommittee on HUD-Independent Agencies Appropriations, stated that he intended to work for a fiscal 1983 authorization for GNMA Tandem with or without a budget request from the Administration in order to ensure that section 8 projects that do not receive assistance under the 1982 appropriation do receive assistance in 1983. *See* 127 Cong.Rec. H 9193 (December 10, 1981). If the program is not discontinued, the plaintiffs are in the same position as they were in January, 1981. Private developers of assisted housing in the Chicago area may proceed through the GNMA lottery and the odds are that some of them will obtain Tandem financing. Those that do not succeed through the lottery this year will be given priority next year.[12]

It is worth noting that plaintiffs attempted to negotiate a set-aside of GNMA Tandem funds for projects in the Chicago area into the decree in August, 1980, but failed to obtain HUD's consent to such a requirement. Plaintiffs maintain that they attempted to negotiate the set-aside and were willing to accept the decree without a Tandem set-aside in light of the prevailing assumption that the Tandem program would continue indefinitely as it had for the prior three or four years, an assumption that might now prove to have been incorrect. But to the extent that that assumption was reasonable in late 1980, it was not as reasonable as of March, 1981, when the Administration announced that the program might be discontinued. Yet plaintiffs went along with the proposed consent decree at that date as well.

**10.** We do not mean to cast any aspersions upon plaintiffs' counsel's decision not to raise this issue before June, 1981. Indeed, it may very well have been the wiser course to accept the decree as it stood at the time, after a prolonged period of intense negotiation and with a new administration in Washington, D. C., bent on making sweeping changes in domestic policy and programs. There was no certainty at that time, nor is there today, that the Tandem program would be abolished. Furthermore, while GNMA financing was an important instrument for achieving relief under the decree, the consent decree is a lengthy document with other provisions and avenues of relief that are not affected by the existence of GNMA financing.

As the history of this case illustrates, the world does not stand still while the parties attempt to negotiate a settlement. The risk that the prevailing political, social, or economic winds will change during the course of lengthy negotiations is one that afflicts any major litigation. Tactical decisions must necessarily be made with respect to the effect of such changes on the parties' positions. In short, plaintiffs' counsel's alternatives—renegotiation or acceptance—during the time period between the signing of the decree by the parties and its approval by the Court may not have been wholly satisfactory and the choice most difficult. But we are satisfied that able counsel's decision not to negotiate with a new and self-described fiscally conservative administration was knowingly made after due deliberation. This choice may not be second guessed at this time—not even by plaintiffs themselves.

**11.** This case is thus distinguishable from *Fox v. Department of Housing and Urban Development,* No. 75–445 (E.D.Pa. November 18, 1981). In *Fox,* the court found that "[s]ince the consent decree was executed and entered [in 1978], interest rates have risen enormously, and the 'Ginnie Mae' financing assistance that was easily available is now scarce." Transcript of Opinion at 3. In the instant case, the decree was executed and entered during a period of high interest rates and inadequate supply of GNMA Tandem funds identical to the prevailing circumstances today. Moreover, the continued availability of Tandem funds was in doubt when the decree was entered and the same doubt exists today.

**12.** Moreover, recent changes in HUD's Financial Adjustment Factor, used in determining the amount of HUD's rental subsidy for projects in which all the units are assisted under the section 8 program, may make state bond financing more feasible for section 8 developers. At least 13 of the 25 Gautreaux projects fall into this category.

While the Court is sympathetic to plaintiffs' desire to obtain as much relief as soon as possible under the consent decree,[13] it is reluctant to modify the decree a few short months after its entry without a clear showing that the present circumstances are significantly different than those prevailing at the time the decree was entered. In the absence of such a showing, it is unnecessary to weigh the equities normally involved in a determination of whether a consent decree should or should not be modified. Nevertheless, we do note that it is not clear at this point that the relief called for in the consent decree would be frustrated if the Court did not modify the decree to provide a Gautreaux set-aside out of the fiscal 1982 GNMA Tandem program. The hardship that plaintiffs fear will be visited upon them if their present motion is not granted will only occur, if at all, if Congress acts to eliminate funding for the Tandem program. At this early stage of the implementation process under the consent decree and with the future of the Tandem program currently in a state of flux, it cannot be said that modification of the decree is presently necessary to fulfill the purposes of the litigation as embodied in the decree.[14]

As expressed herein, once litigants enter into a consent decree approved by the Court, they are obligated to make a good faith effort to abide by their court-approved commitments. Any lesser conduct would warrant appropriate action by the Court. However, the Court will not rewrite the decree where one of the parties subsequently seeks further relief for which it could have negotiated at the time of settlement. Accordingly, plaintiffs' motion pursuant to paragraph 8.1 for modification of the consent decree is denied. It is so ordered.

13. Although the decree does not contain a time limit within which the goal of 7,100 units of assisted housing must be achieved, this does not give HUD a license to indefinitely delay the relief contemplated by the decree. At some point, a court may be justified in concluding that modification of the decree is necessary because the purposes of the litigation embodied in the decree are not being achieved. *United States v. United Shoe Machinery Corp., supra.*

14. The Court expresses no opinion at this time as to whether actual termination of the GNMA Tandem program would constitute a sufficient change in circumstances since the decree was entered to justify a new inquiry into the question of modification of the decree and a re-evaluation of the equities involved in such a determination.