Dorothy **GAUTREAUX, et al., Plaintiffs,**

v.

**CHICAGO HOUSING AUTHORITY, et al., and Andrew Cuomo, Secretary of the Department of Housing and Urban Development, Defendants.**

Nos. 66 C 1459, 66 C 1460.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 26, 1997.

Jerome Butler, General Counsel, Chicago Housing Authority, Chicago, IL, Linda Wawzenski, Asst. U.S. Atty. and Deputy Chief Civ. Div., Chicago, IL, Carole Wilson, Office of General Counsel, U.S. Dept. of Housing and Urban Development, Washington, DC, Lewis M. Nixon, Regional Counsel, John Jensen, Assoc. Regional Counsel, U.S. Dept. of Housing and Urban Development, Chicago, IL, for defendants.

Thomas E. Johnson, Johnson Jones & Snelling, Chicago, IL.

Susan Getzendanner, Nancy Eisenhauer, Skadden, Arps, Slate, Meagher & Flom (Illinois), Chicago, IL.

Daniel Levin, The Habitat Co., Chicago, IL.

Michael L. Shakman, Barry A. Miller, Edward W. Feldman, Derek L. Cottier, Miller, Shakman, Hamilton, Kurtzon & Schlifke, Chicago, IL.

Alexander Polikoff, Julie Elena Brown, Business and Professional People for the Public Interest, Chicago, IL.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

This litigation dates back to 1966 when black residents of Chicago's public housing brought a class action [1] against the Chicago Housing Authority (CHA) and the Department of Housing and Urban Development (HUD), alleging that the defendants violated federal constitutional and statutory provisions by basing public housing policies and practices on race. Specifically, CHA intentionally limited the number of black families living in white housing projects and deliberately targeted only predominantly black neighborhoods in which to build public housing, while HUD knowingly assisted CHA in carrying out this discrimination. *Gautreaux v. CHA,* 296 F.Supp. 907 (N.D.Ill.1969) (liability against CHA); *Gautreaux v. Romney,* 448 F.2d 731 (7th Cir.1971) (liability against HUD). In 1969, a judgment order was entered against CHA, *Gautreaux v. CHA,* 304 F.Supp. 736 (N.D.Ill.1969), and after years of litigation at all levels of the federal judiciary, a consent decree was entered into with HUD, *Gautreaux v. Landrieu,* 523 F.Supp. 665 (N.D.Ill.1981), *aff'd,* 690 F.2d 616 (7th Cir. 1982). Numerous disputes since then have

---

1. The class was defined as black tenants of and applicants for public housing in Chicago. 304 F.Supp. 736, 737 (N.D.Ill.1969). Although we understand that the lead named plaintiff, Dorothy Gautreaux, has passed away, we presume that substitution of new class representatives has or will take place. *See Hassine v. Jeffes,* 846 F.2d 169, 176 n. 3 (3d Cir.1988) (if named plaintiff-inmate transferred from institution, current inmate may be substituted to represent class); *Van Horn v. Trickey,* 840 F.2d 604, 608 (8th Cir.1988) (same); *Doe v. Reivitz,* 830 F.2d 1441, 1451 (7th Cir.1987) ("Substitution of named parties might be necessary in the future to assure representativeness if additional proceedings take place in this case...."); *Wilson v. Huntingdon Housing Authority,* No. 84–5028, 1985 WL 13513, at *1 (6th Cir. July 17, 1985) ("If this case is to continue as a class action, some current resident of public housing administered by the Huntingdon Housing Authority should be substituted as a named plaintiff....").

generated several other orders dealing with the implementation of the CHA judgment and the HUD consent decree. *E.g., Gautreaux v. Chicago Housing Authority,* 1991 WL 49568 (N.D.Ill. April 4, 1991).

Presently before us are four motions: (1) the plaintiffs' motion to modify the judgment order against CHA; (2) HUD's motion to terminate the consent decree; (3) the plaintiffs' motion to enforce a provision of the consent decree prohibiting HUD from approving CHA's use of certain forms of § 8 housing assistance payments, 42 U.S.C. § 1437f, unless specific location requirements are met; and (4) the plaintiffs' motion to declare that HUD must set aside § 8 contract authority for fiscal year 1997. For the reasons discussed below, we deny the plaintiffs' motion to modify the judgment order, grant HUD's motion to terminate the consent decree, and deny the plaintiffs' two motions under the consent decree.

## I. Modification of CHA Judgment Order

At the outset, we explain generally the 1969 judgment order to provide background for the plaintiffs' motion to modify it. The judgment order divided Cook County's census tracts into two categories: the Limited Public Housing Area and the General Public Housing Area. The Limited Area was essentially defined as those census tracts composed of 30% or more non-white population, while the remaining tracts constituted the General Area. Attempting to remedy the effects of past discriminatory site-selection and tenant assignment procedures, the judgment order in essence prohibited any development of public housing in the Limited Area without simultaneous development in the General Area. Judgment Art. II(C), 304 F.Supp. at 738. Because CHA proved inept at building public housing on scattered-sites, we appointed a Receiver for the program in 1987 and it

was not until then that construction began in earnest.

Now, as the scattered-sites program continues under the Receiver, the plaintiffs contend that § 8 rent subsidies [2] have replaced new construction as the primary means for providing public housing. Pls.' Mot. ¶ 4. According to the plaintiffs, this shift in federal housing policy justifies modifying [3] the judgment order in order to bring the CHA's use of § 8 certificates under the order's auspices. Furthermore, the plaintiffs point out, fewer than 3000 scattered-site units have been built so far and approximately only 7000 more families have been assisted by the separate HUD § 8 program under the consent decree; meanwhile, the members of the class comprise 40,000 families.

In order to prevail on a motion to modify the judgment order, the plaintiffs must show that the "principal objects" of the order have not been achieved. *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968); *see United States v. Local 560 (I.B.T.),* 974 F.2d 315, 331–32 (3d Cir.1992); *Gautreaux v. Weaver,* 535 F.Supp. 423, 426–27 (N.D.Ill. 1982). We examine the "specific facts and circumstances," *United Shoe Machinery,* 391 U.S. at 248, 88 S.Ct. at 1499, and weigh the equities at stake in determining the propriety of modification, *Weaver,* 535 F.Supp. at 426. Importantly, even if the "principal objects" of the original order have not yet been fully achieved, we must consider whether other reasons outside the control of the defendant have prevented success and whether adherence to, rather than modification of, the current injunction may be the most fair alternative. These latter considerations inform our inquiry because, as the school desegregation cases instruct us, federal court supervision of

---

2. Section 8 of the United States Housing Act, 42 U.S.C. § 1437f (as amended), authorizes the Secretary of HUD to enter into "annual contributions contract[s]" with public housing agencies, § 1437f(b), (o), which in turn make assistance payments on behalf of recipients who hold the § 8(b) "certificates" or § 8(o) "vouchers," 24 C.F.R. § 982.1.

3. Although the plaintiffs belatedly attempt to characterize their request as one for "particularization, not expansion, of the judgment order,"

Pls.' Reply at 3, we agree with their earlier acknowledgment that "[b]ecause the Section 8 rent subsidy program was not in existence when the judgment order was entered, CHA's Section 8 program was not part of the relief provided to the plaintiff class," Pls.' Mot. ¶ 5. Indeed, it was the later HUD consent decree that purported to indirectly oversee CHA's use of § 8 rent subsidies by imposing limits on HUD's ability to approve CHA's contract authority. *See* Consent Decree ¶ 5.8.1.

local government operations should be a "temporary measure to remedy past discrimination" and is "not intended to operate in perpetuity." *Board of Educ. of Oklahoma City Pub. Schs. v. Dowell,* 498 U.S. 237, 247, 248, 111 S.Ct. 630, 636, 637, 112 L.Ed.2d 715 (1991).

We start, then, with the judgment order's principal objects: "to prohibit the future use and to remedy the past effects of the defendant Chicago Housing Authority's unconstitutional site selection and tenant assignment procedures." 304 F.Supp. at 737. By 1968, CHA's site selection had placed 99.5% of 30,848 public housing units in mostly black neighborhoods and tenant assignment had reserved four projects to be populated almost entirely by whites. 296 F.Supp. at 909–10.[4] While it might be expedient to simply accept the plaintiffs' assertion that "[t]he vast majority of CHA's family public housing still consists of the same segregated units, in the still segregated neighborhoods," Pls.' Reply at 5, as well as the plaintiffs' unstated assumption that the assertedly segregative situation is entirely a result of CHA's original discrimination, we must insist on specific facts supported by evidence. For example, relevant information to test the first assertion would include the number of public housing projects that remain predominantly white and the number of projects located in the Limited Area and the General Area. If the evidence shows that segregation in public housing still exists, then we must explore the link between the current segregation and CHA's original discrimination, past remedial efforts (or lack thereof), current remedial efforts, and future plans. For example, we would examine the quantity and location of affordable land in the General Area remaining for site selection, the effects of private decisionmaking on the current segregative state, and the effects of the shift in demographics over the years.

Without such evidence, we cannot grant the plaintiffs' motion to modify the judgment order. In the absence of a showing that the judgment order's objectives are not being accomplished and that the extent of the lack of progress is largely grounded in the original discrimination, it would be improper to add thousands of § 8 rent subsidy certificates and vouchers to the judgment order. The Receiver has, relatively speaking, only recently begun to implement the judgment order and we should allow time for the scattered-site program to work before turning to another form of relief, especially if CHA is now cooperating in implementing the order to the extent practicable. Indeed, the scattered-side program most directly deals with CHA's original violations—placement of public housing projects solely in black neighborhoods—while § 8 rent subsidies are already usable by the recipients throughout Illinois, *see* 42 U.S.C. § 1437f(r). Although it is likely that some § 8 recipients would rather five in the General Area but cannot find affordable rental units in the private market, the plaintiffs have not shown that the original site selection and tenant assignment proximately created this situation. *Cf. Freeman v. Pitts,* 503 U.S. 467, 496, 112 S.Ct. 1430, 1448, 118 L.Ed.2d 108 (1992).[5] Accordingly, we conclude that the record fails to support the plaintiffs' proposed modification.

## II. Termination of HUD Consent Decree

■ Next, HUD moves to terminate the consent decree entered into in 1981. The consent decree divided not only Cook but its collar counties as well into Limited, General, and "Revitalizing" Areas. 523 F.Supp. at 668. "[R]ecognizing that total relief to *Gautreaux* families outside the Limited Area could not be provided in the foreseeable future, the proposed decree introduce[d] the concept of Revitalizing Areas, that is, areas which have substantial minority population and are undergoing sufficient redevelopment to justify the assumption that these areas will become more integrated in a relatively short time." *Id.* at 669. With this expanded metropolitan-wide relief, the primary goal

---

4. The 99.5% figure did not include the four almost entirely white public housing projects, 296 F.Supp. at 910.

5. We acknowledge that the "vestiges of segregation ... may be subtle and intangible," *Freeman,* 503 U.S. at 490, 112 S.Ct. at 1445, but even though the location of public housing sites is strongly linked to CHA's original site selection practices, the plaintiffs have thus far failed to proffer evidence that the private rental market is the product of the original discrimination.

was to place 7100 public housing residents in the General and Revitalizing Areas:

> 5.1. Following the effective date, HUD will provide assisted housing to eligible persons as set forth in this Part 5 until the number of occupancies of assisted housing units in the General Area and/or in the Revitalizing Area, pursuant to the contracts referred to in paragraph 5.4, commenced by eligible persons equals 7,100.

Consent Decree ¶ 5.1.

HUD now moves to terminate the consent decree because on October 2, 1996, the 7100 target was met, although HUD acknowledges that we should retain jurisdiction over the plaintiffs' attorneys' fees petition. The plaintiffs do not object to termination of the consent decree, but have moved for enforcement of specific provisions of the decree that would continue to place certain obligations upon HUD. We deal with those motions below, and thus grant HUD's motion to terminate the consent decree and retain jurisdiction over the plaintiffs' attorneys' fees petition.[6]

### III. HUD's Set Aside Obligation in Fiscal Year 1997

As indicated above, the plaintiffs acknowledge that the 7100 target was met October 2, 1996. Even though HUD has attained this target, however, the plaintiffs contend that HUD must still authorize § 8 New Construction/Substantial Rehabilitation units as provided for in ¶¶ 5.5.2 and 5.5.3 of the decree.[7] Those paragraphs provided:

> 5.5.2. HUD will set aside contract authority for 250 Section 8 New Construction and/or Substantial Rehabilitation units per year commencing at the beginning of Fiscal Year 1982 for use in multifamily projects to be located in the General Area or in the Revitalizing Area and that are insured under the National Housing Act....
>
> . . . .

5.5.3. HUD will set aside contract authority for 100 Section 8 New Construction and/or Substantial Rehabilitation units per year, commencing at the beginning of Fiscal Year 1982, for use in projects that will increase housing choice for large minority families living in the Limited Area of the City of Chicago by providing Section 8 New Construction and/or Substantial Rehabilitation assisted housing for such families at locations in the General Area or in the Revitalizing Area accessible to public transportation.

According to the plaintiffs, HUD's obligation to "set aside contract authority" for fiscal year (FY) 1997 arose on October 1, 1996, and was not extinguished by the attainment of the 7100 target one day later.

It is true that HUD's obligation to "set aside" the § 8 units arose on the first day of FY1997. We earlier held that the appropriate reading of the consent decree required HUD to set aside the funds on that particular day, rather than permit HUD to set aside funds anytime during the fiscal year. *Gautreaux v. Pierce*, 548 F.Supp. 1298, 1300–01 (N.D.Ill.1982). Setting a firm date for the set aside obligation comported best with the purpose of the decree: to provide a "continuous stream of relief" instead of "repeated gaps [in funding] of indeterminate length." *Id.* at 1300.

We did not, however, expressly or implicitly determine that HUD, having set aside the funds at the start of the fiscal year, would be required to continue to execute the § 8 contracts after reaching the 7100 target. We are instead persuaded that ¶ 5.1 means exactly what it says when it directs HUD to provide assisted housing "until" the 7100 target is reached. Although HUD must "set aside" the § 8 units at the start of the fiscal year, the units are "for use" after that date,

---

**6.** It appears that HUD has voluntarily agreed to continue certain commitments to the *Gautreaux* programs, HUD's Resp. at 11, and we take this as a salutary sign. We hope HUD, having once assisted a local government violate the constitutional rights of thousands, will adhere to its declaration of policy: "to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income and,

consistent with the objectives of this chapter, to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs." 42 U.S.C. § 1437.

**7.** Because the particular § 8 programs referred to in ¶¶ 5.5.2 and 5.5.3 were repealed in 1983, the plaintiffs actually seek comparable relief as provided for in ¶ 8.6 of the decree. *See* HUD's Resp. at 3 n. 3; 523 F.Supp. at 681–82.

¶¶ 5.5.2, 5.5.3, and nothing in ¶ 5.1 suggests that HUD must continue to provide the units after the 7100 goal is reached. Indeed, even "unused" units otherwise available "for use" in the next year expire when "HUD's obligations have terminated pursuant to paragraph 5.1, 5.2, 8.1 or 8.2." ¶¶ 5.5.2.c, 5.5.3.b.[8] Accordingly, we conclude that HUD's obligation to provide further assistance under ¶¶ 5.5.2 and 5.5.3 ended on October 2, 1996.

### IV. HUD's Approval of CHA § 8 Contract Authority

■ Finally, the plaintiffs move to enforce ¶ 5.8.1 of the consent decree. Paragraph 5.8.1 generally prohibits HUD from approving certain § 8 assistance in Chicago unless at least one-third of the units are used in the General Area and no more than one-third of the units are used in the Limited Area:

> 5.8.1. In any fiscal year unless otherwise ordered by the Court under paragraph 8.4, HUD will not approve housing assistance plans or approve or set aside contract authority for Section 8 New Construction or Existing (other than Moderate Rehabilitation) housing in the City of Chicago unless (a) not less than one-third of the units of Section 8 New Construction housing and not less than one-third of the units of Section 8 Existing housing (other than Moderate Rehabilitation) within the City of Chicago are to be physically located within the General Area, and (b) not more than one-third of the units of Section 8 New Construction housing and not more than one-third of the units of Section 8 Existing housing (other than Moderate Rehabilitation) within the City of Chicago are to be physically located within the Limited Area.

523 F.Supp. at 679–80. According to the plaintiffs, and not seriously disputed by HUD, over one-third of the § 8 assistance units have been used in the Limited Area since the entry of the consent decree in 1981. Apparently, the plaintiffs and HUD have been negotiating for several years to resolve

the noncompliance without success. Now, the plaintiffs seek unspecified relief.

We deny the motion because of the impracticality of shaping appropriate relief for the noncompliance after the plaintiffs year-after-year failed to enforce the provision. The plaintiffs themselves admit that "[t]he last thing plaintiffs would have desired was a cut-off of Section 8 funding for Chicago families," Pls.' Reply at 11, but that is precisely what the consequence of enforcing ¶ 5.8.1 would have been. Moreover, the decree itself contains a mechanism under which HUD could have annually petitioned this court to waive the requirements of ¶ 5.8.1 by reclassifying Limited Areas as Revitalizing or General Areas. *See* Decree ¶ 8.4. After the plaintiffs' failures to move to enforce ¶ 5.8.1, HUD each year lost a meaningful opportunity to petition for reclassification under ¶ 8.4. *Cf. Zelazny v. Lyng,* 853 F.2d 540, 543 (7th Cir.1988) (laches applied where plaintiff inexcusably delayed and defendant suffered prejudice). Furthermore, each year's approval of § 8 contract authority in Chicago resulted in the use of the subsidies; the plaintiffs provide no suggestion regarding how to undo or remedy those tenants' voluntary uses of the subsidies. Indeed, we cannot identify the contours of the harm inflicted by HUD's annual approval, and without ascertaining the scope of the harm, fashioning relief would be arbitrary. Finally, we point out that HUD's duties under paragraph 5 of the decree ended when the 7100 target was reached, *see* Decree ¶ 5.1, including the limitations imposed by ¶ 5.8.1.

### V. Conclusion

For the reasons explained above, we deny the plaintiffs' motion to modify the judgment order against CHA; grant HUD's motion to terminate the consent decree while retaining jurisdiction over the plaintiffs' attorneys' fees petition; deny the plaintiffs' motion to declare that HUD has a continued obligation

---

8. We find unpersuasive the plaintiffs' reliance on a purported implication contained in an October 1992 agreement entered into with HUD. In that agreement, HUD received, in exchange for some other consideration, a 50 occupancy credit toward the 7100 target; the parties conditioned the agreement so that if the 7100 target would be reached at the end of the fiscal year because of

the credit, then the credit would not be counted that year. Letter of October 28, 1992. However, the agreement can be read as simply ensuring that the set aside obligation would arise in those circumstances and the plaintiffs could take advantage of the funds in the next fiscal year *until* the 7100 target was reached without the 50 occupancy credit.

for FY1997; and deny the plaintiffs' motion to enforce ¶ 5.8.1. It is so ordered.