**Dorothy GAUTREAUX, et al., Plaintiffs,**

v.

**CHICAGO HOUSING AUTHORITY, Defendant.**

No. 66 C 1459.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 23, 1998.

Jerome Butler, General Counsel, Chicago Housing Authority, Chicago, IL.

Linda Wawzenski, Asst. U.S. Atty. & Deputy Chief Civil Div., Chicago, IL.

Carole Wilson, Office of General Counsel, U.S. Dept. of Housing & Urban Development, Washington, DC.

Lewis M. Nixon, Regional Counsel, John Jensen, Assoc. Regional Counsel, U.S. Dept. of Housing & Urban Development, Chicago, IL.

Thomas E. Johnson, Johnson, Jones & Snelling, Chicago, IL.

Susan Getzendanner, Nancy Eisenhauer, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL.

Daniel Levin, The Habitat Company, Chicago, IL.

Michael L. Shakman, Barry A. Miller, Edward W. Feldman, Derek L. Cottier, Miller, Shakman, Hamilton, Kurtzon & Schlifke, Chicago, IL.

Alexander Polikoff, Julie Elena Brown, Business and Professional People for Public Interest, Chicago, IL.

### MEMORANDUM OPINION
### AND ORDER

ASPEN, Chief Judge.

Nearly thirty years ago, United States District Judge Richard B. Austin entered a judgment order against the Chicago Housing Authority (the CHA) with the hopes of correcting the effects of that agency's unconstitutional public housing site selection and tenant assignment procedures. *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736 (N.D.Ill.1969). Blacks then made up 90% of the CHA'S tenant base, but the CHA had deliberately restricted the number of blacks who could live in the four housing projects which were located in predominantly white areas, to the point where 93% to 99% of the tenants in those units were white. *Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907, 909 (N.D.Ill.1969). The other CHA units—the 99 1/2% which were located in predominantly black areas—housed the rest of the CHA's tenants, 99% of whom were black. *See id.* at 910. This arrangement, ruled Judge Austin, violated the Fourteenth Amendment. *See id.* at 914. And in a comment worth recalling here for its relevance today, he wrote:

> It is ... undenied that sites for the projects which have been constructed were chosen primarily to further the praiseworthy and urgent goals of low cost housing and *urban renewal.* Nevertheless, a deliberate policy to separate the races cannot be justified by the good intentions with which other laudable goals are pursued.

*Id.* (citing *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)) (emphasis added).

The building block of Judge Austin's remedial judgment order was the Dwelling Unit, "an apartment or single family residence which is to be initially made available to and occupied by a low-income, non-elderly family, subsequent to the date hereof, directly or indirectly by or through CHA." *Gautreaux*, 304 F.Supp. at 737. He barred the CHA from "authoriz[ing], approv[ing], or implement[ing] any plan for Dwelling Units" or from "seek[ing] any approval or request or accept[ing] any assistance from any government agency with respect thereto" unless the plan's Dwelling Units were located in conformity with the order's requirements. *Id.* at 738. The order mandated that the CHA erect three Dwelling Units in a General Area (i.e. areas in Cook County with a white population of 70% or more) for every one Dwelling Unit it erected in a Limited Area (i.e. areas with a minority population of 30% or more), *id.* at 738–39, though it did not *require* any new construction. This ratio was later changed from 3–to–1 to 1–to–1.

In 1993, the CHA applied for and received $50 million from the Department of Housing and Urban Development (HUD) under the auspices of the HOPE VI program (an acronym for Homeownership and Opportunity for People Everywhere). Congress created the HOPE VI program in 1992 with the goal of "empower[ing the] residents of severely distressed and obsolete public housing." S.REP. 102–356, at 70 (1992). It intended to accomplish this via a three-part plan: (1) eliminating and (in some form) replacing dilapidated public housing structures, (2) providing residents of those structures with the skills necessary to achieve self-sufficiency, and (3) instilling a sense of community activism in residents of the blighted areas. *See id.* at 71.

It is the first part which is now at issue, as the CHA believes that it must spend its HOPE VI construction funds exclusively in the "3 separately defined areas containing the community's most severely distressed projects," to which the 1992 HOPE VI appropriation refers. *See* Pub.L. No. 102–389, 106 Stat. 1579 (codified as a Note to 42 U.S.C. § 1473*l*). This would mean, of course, that any construction of new public housing units[1] would take place in the distressed

---

1. The CHA attempts to draw a distinction between replacement construction—construction

areas, which, by unfortunate circumstance, are also Limited Areas as defined by the judgment order. Recognizing that the judgment order requires equal construction in the General and Limited Areas, the CHA has asked that we "clarify" the judgment order and read it as not governing any use of HOPE VI funds.

The plaintiffs take issue with this request. They have previously pointed out to this Court that the construction of new public housing units is no longer in vogue, *see Gautreaux v. Chicago Housing Authority*, 981 F.Supp. 1091, 1093 (N.D.Ill.1997), and the HOPE VI money may be one of the few remaining funding sources for the construction of desegregated housing. Of course, if construction funds permanently dry up (and if the plaintiffs do not succeed in convincing us to modify the judgment order, *see, e.g., id.* at 1093–94), then this particular effort to desegregate public housing in Chicago will come to an end. We need not contemplate this possibility today, however, for the dilemma posed by the CHA—that the HOPE VI program compels spending only in Limited Areas while the judgment order compels equal spending in General Areas—rests on an illusion.

The 1992 HOPE VI authorization contemplates an "urban revitalization demonstration program involving major reconstruction of severely distressed or obsolete public housing projects," which is to be focused on "up to 3 separately defined areas, containing the community's most severely distressed projects." Pub.L. No. 102–389. This does not, however, amount to a requirement that all HOPE VI money must be spent physically within those distressed areas. One way to revitalize a distressed public housing neighborhood is to tear down some of the units there and rebuild them elsewhere, thereby lessening the concentration of public housing on the old site. *See* Pub.L. No. 104–134, 110

Stat. 1321 (the 1996 HOPE VI appropriation, providing funds for "replacement housing which will avoid or lessen concentration of very low-income families"); Pub.L. No. 104–204, 110 Stat. 2874 (the 1997 HOPE VI appropriation, providing for the same). HUD's HOPE VI Guidebook contemplates just such an approach, discussing "[p]ublic housing development (including on-site reconstruction *as well as construction of off-site housing*) funded by HOPE VI," Pls.' Br. Ex. D (Guidebook p. 1.D.1) (emphasis added), and the legislative history is in agreement, *see* S.REP. 102–356, at 73 ("The balance of the [demolished] units could be replaced through … traditional replacement means, including major reconstruction and *scattered-site development* [emphasis added]…."). In a similar vein, the HOPE VI program also requires that some demolished public housing be replaced by Section 8 housing vouchers, *see* Pub.L. 103–124, which may be used without regard to the boundaries of the General or Limited Areas. *See* 42 U.S.C. § 1473f(r). We see no incompatibility between the HOPE VI program and the judgment order.

It is ironic that the CHA has chosen to argue that it must use the HOPE VI funds for urban renewal and to the exclusion of desegregation, for, as we observed earlier, in 1969 it attempted to characterize desegregation as a byproduct of urban renewal efforts. No matter: Congress and HUD, through HOPE VI, have afforded the CHA an opportunity both to revitalize distressed public housing neighborhoods and to desegregate public housing, and the CHA is duty-bound to vigorously pursue desegregation opportunities. *See Gautreaux*, 304 F.Supp. at 741 (judgment order Article VIII); *see also Gautreaux v. Landrieu*, 498 F.Supp. 1072, 1075 (N.D.Ill.1980) ("Difficulty in attaining racially integrated public housing shall not be further condoned…. The CHA must have only one

---

which does not add to the agency's aggregate housing stock—and wholly new construction; the CHA argues that the injunction only governs the latter. This distinction may, as the CHA claims, have great significance to other housing decisions, but the judgment order does not differentiate between reconstruction and new construction: it speaks simply of Dwelling Units "initially make available to and occupied by a

low-income, non-elderly family, subsequent to the date hereof." *Gautreaux*, 304 F.Supp. at 737. Housing units constructed with HOPE VI funds obviously qualify, and the use of such funds for the ends of desegregation is in keeping with the sweeping nature of the judgment order, the terms of which are as broad as the violation which it was designed to correct.

concern, housing in compliance with the repeated orders of this Court.").

We hold that the judgment order governs the CHA'S use of HOPE VI funds, Accordingly, any construction of public housing in Cook County must conform to the judgment order's locational requirements. It is so ordered.